KANSAS PACIFIC RLY. CO. V. MARGARET SALMON, *Adm'x.*

1. PLEADING; *Amending Petition; Changing Nature of Claim.* This action was brought by Margaret Salmon as administratrix of the estate of Daniel Salmon, deceased, against the Kansas Pacific Railway Company, under § 422 of the civil code, for damages resulting from the death of said Daniel, claimed to have been wrongfully caused by the said Railway Company. In the original petition it was alleged that Salmon was killed through the negligence of the Railway Company, while he was being transported by them as a passenger; but afterward the petition was so amended as to make it allege that Salmon was killed through the negligence of the Railway Company while he was being transported by them as an employe of the company: *Held,* that the court below did not err in allowing said amendment to be made.

2. ———— A pleading may be amended by inserting allegations *material* to the case; and every material amendment of a petition must of necessity change more or less the nature of the cause of action.

3. EVIDENCE — *Whether President and Directors of Railway Company give Personal Attention to Operating Road; Competency.* In an action against a railway company to recover damages for wrongfully causing the death of an employe, it is not error to admit testimony which tends to show that the president and directors of such railway company reside in other states, and give very little personal attention to the operating of the road.

4. ———— *Incompetency of Conductors and Engineers.* It is not error for the court to admit testimony tending to show incompetency on the part of conductors and engineers of colliding trains.

5. CONTRIBUTORY NEGLIGENCE; *Question of Fact; Effect of Verdict.* A verdict that the death of the deceased "was caused by the gross negligence of the defendant, without any fault" of said deceased, is substantially an affirmative finding that the deceased during the whole transaction resulting in his death exercised due care and diligence to protect himself from injury, and to do his duty toward his employer.

6. VERDICTS; *Approval by Trial Court.* Where a jury return a verdict against the weight or preponderance of the testimony, and the trial court, upon a motion to set aside the verdict and grant a new trial because the verdict is not sustained by sufficient evidence, approves such verdict and gives judgment thereon, if there is some evidence to sustain the verdict in every essential particular this court cannot reverse the judgment merely because the verdict does not seem to be sustained by sufficient evidence.

*Error from 'Leavenworth District Court.*

THE defendant in error as administratrix of the estate of her deceased husband Daniel Salmon, brought suit against the *K. P. Railway Company* to recover damages sustained by the widow and heirs of said deceased by reason of his death. The action was commenced in October 1871, and was here on error two years ago, and will be found reported in 11 Kas., 83, where a full statement of the facts, agreed and admitted, will be found in the statement and opinion. The original petition (11 Kas., 84,) alleged that Daniel Salmon was a *passenger*, riding on defendant's cars, on their railroad, and that his death was caused by the gross carelessness and negligence of the defendant, by its agents and employes, and through no fault or want of care on the part of said Daniel. On being remanded to the district court, that court gave plaintiff leave to amend her petition. This was done. The substantial amendment was the omission of the allegation that the deceased was a passenger, and the inserting, in lieu thereof, an allegation, that, "at the time of the death of said Daniel Salmon the said Daniel was in the employ of said defendant as a locomotive engineer, and as such had charge of an engine from Brookville west for one run west of said point, and that by request and permission of said defendant said Daniel and other employes of the said defendant were

and had for a long time been accustomed to ride on the car on which the said Daniel was then being carried without other compensation than the good offices of said defendant and its employes toward each other, that the said Daniel had no office or duty to perform on said train, and no authority thereon, and that the death of the said Daniel Salmon was caused and produced by the gross negligence of said defendant." This amendment was objected to by defendant, "because and for the reasons, first, that the said amended petition substantially changes the cause of action of plaintiff—second, the cause of action stated in said amended petition is another and different cause of action from that alleged in the original petition filed in said cause—and third, the cause of action on which this suit was brought is abandoned by the said amended petition, and a new cause of action substituted and alleged." The district court refused to strike off the amended petition. The answer was a general denial. Trial at the January Term 1874. An agreed statement of facts was filed, (the same as given in 11 Kas., 89, 90.) Plaintiff called J.P.U. to testify as to place of residence of president and directors of the road, and what officers had personal charge and supervision in operating defendant's railroad. The depositions of the engineer of one of the colliding trains at the time of the collision, and the conductor of the other of said trains, were read, to show the condition of the road, negligence, want of care, and that the weather was foggy, etc. Another witness was called to prove the incompetency of one of the engineers, but he testified on cross-examination that said engineer (Sheldon) "operated his engine as well as the average engineers on the road." Plaintiff then called W. H. Brownhill, who testified as follows:

"My occupation is that of locomotive engineer; have been in that business twenty years; am at present employed on the Atlantic & Pacific Railroad, between Sedalia and State Line. From April to September 1870, I was on the Kansas Pacific Road at Brookville, in charge of the round-house as foreman. Brookville is 200 miles west of the Missouri river, and the terminus of the Kaw-Valley Division and the Smoky-Hill

Division. Before that I had run an engine about four years on the K. P. road. I was appointed foreman by B. Marshall, who was division superintendent of the Smoky-Hill Division. I had a general supervision of everything at that point, men and engines — to see that the engines were got ready and that the men did their duty. I was on duty on the 13th of September 1870. I knew Daniel Salmon. He occupied at that time the position of locomotive engineer, on a freight train. He ran on the Smoky-Hill Division, from Brookville to Ellis. He was killed on the 13th of September, at Clear Creek, a point between Ellsworth and Brookville, on the line of the Kansas Pacific Railroad. I had last seen Salmon before he was killed, the night previous, at Brookville. His family resided at that time at Ellsworth. He had been home to visit his family, and I instructed him to return on the first train in the morning. His family was sick and he had been up late at night, and he got into the caboose to ride back to his daily labor. I was not there, (at Ellsworth,) but know he went home from Brookville to Ellsworth, the night of the 12th. I saw him last alive on the night of the 12th of September, at Brookville; and saw him dead, in the forenoon the next day, at Brookville. His body was brought in, I think, on the same train he was killed on. It was the first train coming east on the morning of the 13th. James Massey was the conductor of that train. E. M. Sheldon was the engineer. The morning of the 13th was very foggy — more so than usual.

"I had known James Massey, the conductor of the train on which the accident occurred, about a year or so. He was mostly employed as a brakeman, occasionally he ran as a conductor. He was not employed as a regular conductor, but occasionally ran a trip or two as a conductor. From my experience as an engineer on a railroad, I should say I was capable of judging of the capacity of a man to run a train as conductor. I had no knowledge of Massey running trains as conductor, only an occasional trip as I have stated. I should say he was not a fit man to run a train, from his lack of judgment and ability, and dissipation. I had known him on the road about a year. I mean by dissipation, that he was in the habit of drinking too much liquor — getting drunk. I had seen him in that fix a great many times. I have not seen him drunk while on duty, because I had no chance to. He was away from me when on duty.

"Marshall occupied the position of division superintendent,

Smoky-Hill division — the same division that the accident occurred on by which Salmon lost his life. Marshall had the sole power to employ and discharge employes in that division. He was the chief officer of the company in that division — the highest authority we knew of. I knew E. M. Sheldon. He was at that time engineer of a freight train. He was the engineer of the train on which Salmon was killed. I had known him then about two years and a half. He was fireman about two years, and engineer about six months. From my experience as a locomotive engineer, and my knowledge of E. M. Sheldon, I could form a judgment as to his capacity as an engineer. I considered him an incompetent man. He lacked judgment and ability in running an engine. He was strictly moral and temperate. He had no bad habits. Mr. Marshall asked me why the engineer that was running that engine could not do better. This was before the death of Salmon. My reply was that it wanted an engineer; that he was no engineer and never would be, and he had better get rid of him. Those were my words to Mr. Marshall. This conversation between myself and the division superintendent in reference to Sheldon was about two months before Salmon's death. Mr. Sheldon was retained on the road, in the capacity of an engineer, after that statement to Mr. Marshall. He remained on the road from the time of that conversation till the death of Salmon, in the capacity of engineer. It was a wood, or construction train that collided with the train upon which Salmon was at the time he was killed. I know this, because I furnished the engineer to run it. The engineer of that train was J. W. Wever. He resides now at Beardstown, Ill. The wood train did not have any conductor that day. The accident by which Salmon lost his life occurred at Clear Creek. At that point the track is crooked and the grade very steep, probably 75 feet to the mile either way, from where the accident happened."

*On cross-examination witness testified as follows:* "I guess I was not the only competent man on that road. I don't know as Mr. Marshall was as competent to judge of the fitness of the men as I was. He had been a railroad man as long. He had a better opportunity of knowing the way Mr. Massey run on the road than I had. My principal business was at a particular point. I had charge of the engines and men there. I know Salmon was killed at Clear Creek, because the men came in and gave an account of an accident, told me all about it. I was not there. I only know his

family was sick by being told so—they told me so, and he told me so. It was customary for Salmon whenever he wanted to, to go home, when he got permission, and on any train he pleased." [The cross-examination was very long, and went over the whole ground of his testimony in chief, and as to his means of knowledge, etc., which was oftentimes mere hearsay.]

Defendant called E. M. Sheldon, who testified that he had been railroading since 1867; was a locomotive engineer, and as such engineer was in employ of the K. P. Railroad Co. from 1869 to 1872. He further testified—

"I was the engineer of the train on which Salmon was riding when he was injured. The train was the regular freight, running between Ellis and Brookville. We left Ellis in the night-time before the morning on which the accident happened. We were at Ellsworth at about daylight, and stayed about 25 minutes and then started east. James Massey was conductor on the train. He had been running from Ellsworth to Sheridan, and from Brookville to Ellis on the same division with me. Salmon was injured about one mile east of Summit siding, and about 15 miles from Brookville. The accident occurred about half after seven o'clock in the morning, near a place called Clear Creek. The train of which I was the engineer had broken in two; we had to stop to make a coupling. After the coupling was made the conductor gave a signal to back up to get a start at the hill, of which we were at the bottom. We had backed up about fifteen car lengths, were backing very slow, (about four miles an hour) when I saw a train and engine approaching us from the west; (we were backing west.) I immediately put my engine in the forward motion, blew one whistle for brakes, and had my train stopped or nearly so, when we were struck by the train that I had seen coming. I did not get off from my engine before they struck us, but immediately after left my engine and ran to the scene of the wreck. The train I saw coming was approaching us on a down grade. It was a very dewy, foggy morning, and the rails wet. During the time I was backing, up to the time of the collision, any person in the caboose of the train could have safely got off from it onto the ground very easily, and without danger of being hurt. All the persons that were on the caboose except Salmon, did get off. The caboose was situated at that time on the hind end of the train of which I was the engineer. The train

which collided with mine was hauling wood, and was an irregular train. I was not aware that there was any such train on the track, and had no notice thereof. After coupling my train I do not think we could have ascended the grade without backing up to get the headway. The track was very slippery, impossible for an engine to use any great amount of steam without slipping. Aside from blowing one whistle for brakes, I know of no efforts the approaching train made to stop. I heard them whistle for brakes. At the time of the collision I was on my engine. We can feel the effect of the stroke of a collision at the rear end of a train on the engine. The jar was not very heavy on the engine, not as hard as I have seen it on engines backing into trains to make a coupling. No other person was injured on that train nor by the collision except Salmon. John Wever was the engineer of the train that collided with my train. I was on the road when he came onto the road, and at the time of the accident I had known him about two years. I think they did not have a conductor on the train. Wever is a competent engineer. Massey is a competent conductor. I think I was a competent engineer at that time. At the time of this collision and for some time before, Brownhill was the foreman of the round-house at Brookville."

The deposition of B. Marshall, a witness for defendant, was read. He testified that he was one of the assistant superintendents upon defendant's railroad for more than three years before the 14th of September 1870, and continued such superintendent until the winter of 1871; that at the time of the accident mentioned, and for several months prior thereto, he had been in the charge and superintendence of the division of the defendant's railroad, between Brookville and Ellis, and of that part of the road where said accident occurred; that he was well acquainted with Sheldon, engineer, and Massey, conductor of the train on which Salmon was injured; that he was also well acquainted with Wever, the engineer of the train colliding with the said train on which Salmon was; that he employed all of said persons; that he used due diligence in the employment of each of them; that he knew the qualifications of each of said persons, and that each of them was entirely competent for the business in which he was at that time engaged; that Sheldon was in all respects a competent engineer; that Massey was a competent conductor, and that both of them were competent, careful and temperate; that he never had any notice from Brownhill, or any other

person, that either the said Sheldon, Massey or Wever was incompetent or negligent, or that they were, or that either of them was intemperate, or addicted to the use of intoxicating liquors.

M. D. Smith, a witness for defendant, testified that he was a locomotive engineer, and had been about ten years; had been on the Kansas Pacific railroad ever since the spring of 1867. He had known E. M. Sheldon about five years. Sheldon's intelligence, habits of industry, competence to perform his duties, etc., were all good; he performed his duties well in every respect. (Witness also testified that Massey was "called a good man," "did not neglect his business," etc.)

Other testimony of like import was given on the part of the defendant. (The transcript is printed, and occupies two hundred pages.) The instructions given by the court of its own motion were very full. The defendant asked sixteen special instructions, of which all were given but the 6th and 9th, which are as follows:

"6th.—Negligence cannot be inferred, but must be proved. The simple fact of the collision of these trains which caused the injury to Salmon is no evidence of negligence in this case on the part of defendant, although the employes in charge of said trains were negligent; and before the jury can find the defendant guilty of negligence which caused the injury to Salmon, they must find that by the preponderance of the evidence the plaintiff has established—*First*, that some of the employes in charge of the colliding trains were guilty of negligence, which caused the collision by which deceased was injured; *second*, that the employes whose negligence caused the injury, were not fit and proper persons to hold the positions they then occupied, and that the defendant employed them without using due care to ascertain their qualifications and fitness for their several positions, and did not believe them to be competent for the same; and *third*, that the person employing them did not of his own knowledge know them to be competent. And unless the jury find from the preponderance of the evidence, that the defendant neglected some duty as above indicated, they must find that the defendant was not guilty of negligence.

"9th.—If Salmon went into said caboose and went to sleep, when if he had been awake and careful of his safety he could

have left the car and escaped injury, his so being asleep in said car is negligence which contributed directly to his own injury, and the jury are warranted in finding that his negligence proximately contributed to the injury which he received."

The jury returned a special verdict, stating the facts found by them. And they added to such finding, "That if, as matter of law, the plaintiff is entitled to recover, we find for the plaintiff, and assess her damages at $9,600." New trial refused, and judgment on the verdict. The defendant appeals, and brings the case here on error. The briefs are very elaborate, and almost entirely devoted to the discussion of questions of fact.

*J. P. Usher*, for plaintiff in error.

*Stillings & Fenlon*, for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This is the second time that this action has been brought to this court. (*K. P. Rly. Co. v. Salmon*, 11 Kas., 83.) When here first it was reversed, and sent back to the court below for a new trial. On being returned to that court the plaintiff below (Margaret Salmon) with leave of the court, but over the objections of the Railway Company, amended her petition. This is the first ruling of the court below now complained of as error. It is claimed that such ruling was erroneous, because the amendment, as is claimed, changed substantially the cause of action and defense. Section 139 of the civil code reads as follows:

"The court may, before or after judgment, in furtherance of justice, and on such terms as may be proper, amend any pleading, process, or proceeding by adding or striking out the name of any party, or correcting a mistake in the name of a party, or a mistake in any other respect, or by inserting other allegations material to the case, or conform the pleading or proceeding to the facts proved, when such amendment does not change substantially the claim or defense. And when any proceeding fails to conform, in any respect, to the provi-

sions of this code, the court may permit the same to be made conformable thereto by amendment." (Gen. Stat., 655.)

With the view that we have taken of the question now under consideration we do not think that it is necessary for us to determine whether the phrase, "when such amendment does not change substantially the claim or defense," applies to and qualifies all that precedes it, or whether it merely applies to and qualifies the words, "or conform the pleading or proceeding to the facts proved." That it does one or the other, seems to be evident; and yet, whichever way we view it, we are led into serious difficulties. It is certain however, as we think, that under said section any pleading may be amended by correcting any mistake therein, "or by inserting other allegations material to the case, when such amendment does not change substantially the claim or defense." In the present case we do not think that the amendment changes substantially the claim or defense. The action under the original petition was an action brought by Margaret Salmon as administratrix of the estate of Daniel Salmon deceased against the Railway Company under § 422 of the civil code, (Gen. Stat., 709,) for damages resulting from the death of said Daniel, wrongfully caused by said Railway Company; and the action as now prosecuted, is still precisely the same. The parties are the same. The action is still prosecuted by the same plaintiff, in the same capacity, against the same defendant, for wrongfully causing the death of the same person, at the same time and place, by the same means, and in the same manner. The amendment is simply this: The original petition stated that Salmon was killed by the Railway Company while being transported by the company as a *passenger*. The amended petition states that he was killed by the Railway Company while being transported by them as an *employe* of the company. In all other respects the two petitions are alike. And as to the proof: Under the original petition the plaintiff had the right to prove that the death of Salmon was caused by the Railway Company through the negligence of any one or more of its servants, agents, or

34—14 KAS.

officers, superior or inferior. Under the amended petition the plaintiff had to show that the death was caused by the railway company through the negligence of some one or more of its *superior* agents, servants or officers. Under the amended petition, if the death had been caused merely through the negligence of some fellow-servant, some co-employe, then the plaintiff could not recover. (*Dow v. K. P. Rly. Co.*, 8 Kas., 642; *U. P. Rly. Co. v. Milliken*, 8 Kas., 647; *K. P. Rly. Co. v. Salmon*, 11 Kas., 83.) These are the only differences required in the proof. The amended petition simply restricts the plaintiff's right to recover by making it necessary for her to show that the death was caused through the negligence of some *superior* officer, agent or servant of the company, instead of allowing her to show that it was caused through the negligence of any officer, agent, or servant of the company, superior or inferior, as the original petition did.

But suppose the amended petition has made such a change that the negligence required to be proved under it is the negligence of an entirely different set of officers, agents or servants, from that required by the original petition, and still such a change does not necessarily change the cause of action or defense. It is not the officers, agents or servants of the company that are sued; and it is not their negligence *as such* of which the plaintiff complains. But it is the railway company that is sued, and *the negligence of the railway company* (through its officers, agents or servants,) of which the plaintiff complains. It can certainly make but very little difference whether the railway company was guilty of negligence through one set of employes, or through some other set, for if the company was guilty of negligence at all it is liable for the same kind and character and amount of damages in one case as in the other; and in either case it devolves upon the plaintiff to show the negligence. The substantial question in the case is, whether the company was guilty of negligence at all; and this was sufficiently charged in either petition.

But it is said that the contract under which a passenger is carried differs widely from the contract under which an em-

ploye is carried, and therefore, that as the original petition alleged that Salmon was carried as a passenger, while the amended petition alleges that he was carried merely as an employe of the company, the cause of action must necessarily have been changed. This need not necessarily be so. In neither case would the obligation of the railway to carry Salmon safely rest wholly or even mainly upon the contract between the parties; but in each case it would rest principally upon the laws of the state. But wherever it might rest, this action was not brought for any breach of contract. The action is not founded upon contract at all. It is more in the nature of an action of tort. It is an action for damages, resulting from a neglect on the part of the railway company to perform a duty imposed upon it by law. It is true, the contract may be shown. Indeed, it must be shown — not for the purpose of recovering for a breach of the contract however, but incidentally for the purpose of showing the *status* of the parties with relation to each other — of showing the legal obligations resting upon each with respect to the other, and of determining whether either has been guilty of negligence or wrong toward the other. And whether Salmon was a passenger, or an employe, the contract between him and the company must thus be incidentally shown merely for such purpose. The legal obligation resting upon railway companies to exercise care and diligence toward their employes does not differ so very much from the legal obligation resting upon them to exercise care and diligence toward their passengers, except in extent. It is the duty of a railway company toward both passengers and employes to see that all its officers, agents and servants, of whatever grade, who have the power from the company to employ, retain, or discharge other employes, or who have the power from the company to furnish implements, machinery or materials to the other employes, for them to operate with, shall exercise reasonable care and diligence in furnishing a sufficient number of competent employes for the work to be done, and in furnishing a sufficient number and amount of proper implements, machinery and materials for

the employes to operate with in accomplishing such work. And the company is liable to either passengers or employes for any injury resulting to them from any want of care or diligence in these respects. *Laning v. N. Y. C. Rld. Co.*, 49 N. Y., 521; *Flike v. Boston & Alleghany Rld. Co.*, 53 N. Y., 549. (The latter case is very much like the case at bar.) These officers, agents or servants of the company, upon whom such powers are bestowed, are what we would designate as the higher or superior officers, agents or servants of the company. And these higher officers, agents or servants cannot with any degree of propriety be termed fellow-servants with the other employes who do not possess any such extensive powers, and who have no choice but to obey such superior officers, agents or servants. Such higher officers, agents or servants must be deemed in all cases, when they act within the scope of their authority, to act for their principal, in the place of their principal, and in fact to be the principal. We also think that it is the duty of a railway company, with reference to both passengers and employes, to exercise reasonable care and diligence in making sufficient regulations for the safe running of trains, so as to avoid danger from collision or from any other source. (Shearman and Redfield on Neg., § 93, and cases there cited.) And a railway company is also responsible for the negligence of its higher or superior officers, agents and servants, even to other employes, when they act within the scope of their authority. Thus far the duty of the railway company toward its passengers and employes is about the same, and here the similarity of duty probably ends. The duty toward employes here stops, while the duty toward passengers extends further. A railway company is not responsible to one employe for the negligence of another employe where they are both engaged in the same common employment. But a railway company is always responsible to a passenger for the negligence of any employe. The grade of the employe within the particular employment does not generally make much difference. If the employe performs the duties of one of the higher officers, agents or servants, of

which we have already spoken, the company is generally responsible for his negligence, whatever may be his grade. But if he is engaged in the same common employment with other employes, the company is generally not responsible for his negligence to the other employes, although he may be in fact the foreman for that particular work. The main issue in the present case is, whether the railway company was guilty of negligence or not toward Salmon. And whether Salmon was a passenger, or merely an employe, is a question of fact brought into the case merely for the purpose of showing the *status* of Salmon toward the company, and thereby of showing whether the things charged against the company amount to negligence or not, and if they do amount to negligence, its nature and character. The fact of Salmon being a passenger, or an employe, is not the cause of action, or the foundation for the cause of action. The negligence of the company,

2. Material amendment may be made. whereby the injury occurred, may more properly be termed the foundation of the cause of action. The fact of Salmon being a passenger, or an employe, is simply one of the facts which enter into the description of the cause of action. It of course is a material fact. The allegation in the petition which sets it forth is a material allegation. But said § 139 of the code authorizes a pleading to be amended "by inserting other allegations *material* to the case." Immaterial amendments need not be made at all, and every material amendment of a petition must of necessity change more or less the nature of the cause of action. But if the amendment does not change the cause of action, or the defense, from one thing to another, we think it may be made. That material amendments may be made, where the amendments are merely of facts descriptive of the cause of action, and do not change the cause of action from one thing to another, we would refer to the following authorities: *Prater v. Snead*, 12 Kas., 447, 449, and cases there cited; *Spice v. Steinruck*, 14 Ohio St., 213; *Knapp v. Hartung*, 73 Penn. St., 290. If the plaintiff should state a cause of action in a petition, and the defendant should take issue upon one of the

facts only stated therein, then whether the plaintiff could so amend his petition as to abandon that fact and set up an entirely new and distinct fact, and thereby wholly change the issue, we are not called upon to decide, as such question is not in this case. In this case the defendant filed a general denial to the plaintiff's petition, denying every fact alleged by the plaintiff. Before passing from this subject it is proper to say, that the power of trial courts to allow or refuse amendments to pleadings, rests to some extent within the sound judicial discretion of such courts; and that appellate courts will seldom reverse the rulings of the trial courts in such cases unless such discretion has been abused. Therefore a decision of an appellate court, sustaining the ruling of a trial court, where the amendment has been refused, is but very little evidence that the appellate court would reverse the ruling of the trial court if the amendment had been allowed.

We have now disposed of the main question involved in this case; and in discussing it we have discussed some of the other questions propounded by counsel. The questions which we have already discussed we shall not again refer to; and those which we have not yet discussed we shall

3. Evidence; personal attention of president of road, etc.; competency.

merely decide, without discussing them in detail. It was not error for the court below to allow evidence to be introduced which tended to show that the president and directors of the railway company resided in other states, a long way from the railroad, and that they gave but very little personal attention to the operating of the road. The witness Brownhill was so obviously a "fast witness," that we suppose the jury knew it, and that they gave to his testimony only such credit as it was properly entitled to. We think however that his testimony sufficiently showed him to be such an expert that the court below did not err in permitting it to go to the jury, and be weighed by them along with the other evidence in the case, for what it was worth; although it afterward appeared that he testified concerning some things as though he had knowledge of them, when in fact he had no knowledge of them whatever. A

small portion of his testimony was stricken out, on motion of the railway company. But there was no motion made to strike out any other portion of his testimony, after it became apparent that it was incompetent. It was not error for the court below to permit evidence to be introduced tending to show incompetency on the part of the conductors or engineers operating the colliding trains; as such evidence along with other evidence tending to show that the collision occurred from such incompetence, and that the railway company was aware of such incompetence, would be strong evidence against the company. As to the order in which the various portions of the evidence should be introduced, where it takes various and distinct portions of evidence to prove any particular fact in issue, the trial court is clothed with a very large discretion.

*4. Incompetency of engineer and conductor.*

Whether Salmon was guilty of contributory negligence or not was a question of fact properly submitted to the jury for their consideration. And the finding thereon by the jury that "The death of said Daniel Salmon was caused by the gross negligence of the defendant *without any fault* of the said Daniel Salmon," was a sufficient finding with regard to said fact. It is substantially a finding of the affirmative fact that Salmon during the whole transaction exercised due care and diligence to protect himself from injury, and to do his duty toward the railway company. It is not an uncommon thing for adverse counsel to characterize a broad and comprehensive statement of a fact, or perhaps what might more properly be termed a simple but comprehensive statement of a compound fact, as a conclusion from facts, a conclusion of law, or a conclusion from facts and of law, forgetting of course that every fact that comes within our comprehension, however simple and diminutive it may be, must be composed of a vast number of other facts more simple and more diminutive. There can probably be no such thing as an ultimate fact, or an absolutely simple fact. All are compounded of other facts. And the division of facts into smaller facts is philosophically as

*5. Contributory negligence, is a question of fact.*

illimitable as the division of time or space into smaller por-
tions.   It takes events to make facts; and events must occur
within time and space, and must therefore be equally divisi-
ble with time and space.   As to the extent of the detail with
which the statement of any particular fact must be governed,
the trial court must always be vested with a very broad and
extended discretion.   More detail is probably required in the
statement of facts in the introduction of evidence than any-
where else in judicial proceedings.   The whole of the 6th
instruction asked for by the railway company, and refused by
the court, was substantially given in other instructions.   The
9th instruction asked for by the defendant, and refused by the
court, is not, as there asked, good law for this case.   It at-
tempted to make the court upon a *single fact* find that
Salmon was guilty of contributory negligence, and withdraw
the question from the jury, while this single fact could not
conclusively prove contributory negligence, and there were
other facts that should have been taken into consideration
along with it.   The court properly instructed the jury that
the plaintiff could not recover if Salmon was guilty of con-
tributory negligence.   If the court below erred as to what
should constitute the measure of damages, it was the fault of
the railway company.   The court adopted the theory of
damages suggested by the railway company, and whether
right or wrong we shall not now reverse the judgment of the
court below because of any supposed error committed by it
with regard to the measure of damages.

This case was very fairly tried in the court below, so far as
the judge had anything to do with it, except possibly that he
ought to have granted a new trial because the
verdict of the jury was not sustained by sufficient
evidence.   The jury made the principal mistake that was
made in the case, in finding a verdict for the plaintiff against
the weight or preponderance of the evidence.   The verdict
ought probably to have been set aside by the court below, and
a new trial granted for this reason.   But as the court below
sustained the verdict, and rendered judgment thereon, thereby

6. Verdict;
approved by
trial court.

presumptively approving the verdict; and as there was evidence to sustain the verdict in every essential particular, we cannot now reverse the judgment merely because the verdict does not seem to be sustained by sufficient evidence. Numerous decisions of this court may be found laying down this doctrine.

The judgment of the court below is affirmed.

All the Justices concurring.