THE UNION PACIFIC RAILWAY COMPANY v. WILLIAM FRAY.

1. DERRICK — *Negligence of Foreman — Personal Injuries — Liability of Company.* A railway company is liable to a laborer, working at a derrick of the company, assisting in hoisting stone and giving signals, for injuries caused by the negligence of the foreman, whose duty it was to direct repairs and keep the derrick in safe condition, if such laborer is without fault.

2. SAFE MACHINERY *for Employés.* As between a railway company and its employés, the railway company is required to exercise reasonable and ordinary care and diligence in furnishing to its employés reasonably safe machinery and instrumentalities for the operation of the work in which they are engaged.

3. DEFECTIVE MACHINERY — *Notice — Defect, Not Remedied.* As between a railway company and its employés, the company is negligent in the use of unsafe or defective machinery, where it has notice of the defect and fails to exercise reasonable and ordinary care in remedying such defect.

4. FINDINGS — *Construction to Support Verdict.* Findings of fact, if supported by sufficient evidence, will be construed so as to support the verdict, if such a construction can be fairly given; and all findings are to be harmonized, so far as possible.

*Error from Wyandotte District Court.*

ON the 2d day of February, 1883, *William Fray* brought his action against the *Union Pacific Railway Company*, for damages for personal injuries. It has been twice brought to

this court, and twice remanded for a new trial. (31 Kas. 739; 35 id. 700.)   The third trial was begun on the 14th day of December, 1887, before the court with a jury.   The jury returned a verdict for Fray, and assessed his damages at $2,000. The following interrogatories were asked, and answered by the jury:

"1. Who was the foreman controlling the men at the derrick?   A. William Ulrich.

"2. On the day of the accident, and before it occurred, did Nelson tell Ulrich that the brake-rope was unsafe?   A. Yes.

"3. How far down had the rock that broke the rope descended from the platform when the rope broke?   A. From seven to ten feet.

"4. How far was it from the platform to the bottom of the pit where the rock was being placed?   A. About forty-two feet.

"5. Was it the duty of Fray to give signals when the rock was being lowered?   A. Yes.

"6. If Fray was to give signals when the rock was being lowered, who assigned him the duty?   A. Wm. Ulrich.

"7. Did the wear and the use of the brake-rope for too long a time cause it to break, or tend to do so?   A. It did.

"8. On the day of the accident, did Ulrich tell Nelson to go on with the brake-rope, after being told by him that it was unsafe?   A. Yes.

"9. Where was Fray at the time of the accident, and what was he doing?   A. On the platform, giving signals."

Upon the request of the railway company the jury answered the following questions:

"1. Did Samuel Mallison, for the defendant, have the control and direction of the work, the way and manner of its performance, including the derrick and its apparatus, where the plaintiff was injured?   A. He did.

"2. Was not William Ulrich foreman of the work under Samuel Mallison?   A. He was.

"3. Was the plaintiff, either by himself or others, informed by Mr. Mallison, acting for the defendant, that there was danger of the brake-rope burning in letting the rock down into place, if the rope was not kept wet?   A. No.

"4. Was the plaintiff, either by himself or with others, informed by William Ulrich that there was danger of the

brake-rope burning in letting down the rock into place, if the rope was not kept wet?  A. No.

"5. Did not Samuel Mallison, at or about the commencement of the work for the defendant, ask the plaintiff to get a bucket of water to be used in watering the brake-rope?  A. Yes.

"6. Did not Samuel Mallison, at or about the commencement of the work on this bridge, direct the plaintiff to pour water on the brake-rope so as to keep it wet while rock were being lowered?  A. No.

"7. If the brake-rope had been kept wet where it wound around the shaft, would it have burned?  A. No.

"8. Did the plaintiff obey the directions of Mallison in respect to keeping the rope wet?  A. No.

"9. Was not the plaintiff warned by Samuel Mallison to be careful and see that the brake-rope was kept wet while rock was being lowered by the derrick to the work below? A. No.

"10. Was not the plaintiff warned by William Ulrich to be careful and see that the brake-rope was kept wet while rock was being lowered by the derrick to the work below? A. No.

"11. Was not the injury to the plaintiff caused by the burning of the brake-rope?  A. Yes, in part.

"12. Would the brake-rope have burned if it had been kept wet?  A. No.

"13. Did anyone for the defendant direct the plaintiff not to observe the directions given him by Mallison, in respect to keeping the rope wet?  A. No.

"14. If you answer the preceding question in the affirmative, name the person who gave such direction, and state what he said.  A. [No answer.]

"15. Was not the plaintiff provided with a bucket of water to be used in wetting the brake-rope?  A.. Not proven that he was.

"16. Was he not supplied with a proper vessel for applying water to the brake-rope?  A. Not proven that he was.

"17. Was not water flowing near by which the plaintiff could get to wet the rope?  A. Not proven.

"18. Was not the brake-rope put on new the day of the accident, or the day before?  A. No.

"19. Was not the brake-rope of size and strength sufficient for the purpose of controlling the lowering of the rock by the derrick?  A. It was large and strong enough when new.

"20. Had not the defendant close at hand upon the work a large quantity of new rope from which brake-ropes were to be taken as often as necessary? A. Yes.

"21. Did not Fray, upon one or more occasions, on other days prior to the accident, pour water on the brake-rope while rock was being lowered? A. Not while rock was being lowered.

"22. Did not Nelson, upon one or more occasions upon other days prior to the accident, while rock was being lowered, before plaintiff was injured, pour water on the brake-rope? A. No, not while rock was being lowered.

"23. Did not Owens, upon one or more occasions, upon other days prior to the accident, while rock was being lowered, before plaintiff was injured, pour water on the brake-rope? A. Owens did on one occasion pour water on rope, but it is not shown that it was done while rock was being lowered.

"24. Was not Fray present when Nelson poured water on the brake-rope? A. We have no such evidence.

"25. Was not Fray present when Owens poured water on the brake-rope? A. He was on the platform.

"26. For what purpose did Fray pour water upon the brake-rope when rock was being lowered? A. He did not pour water while rock was being lowered.

"27. Was not the plaintiff Fray, either by himself or with others, warned by Mallison that it was unsafe for rock to be lowered upon this work, the distance it was necessary to lower it, if the brake-rope was not kept wet? A. No."

[28 and 29 withdrawn.]

"30. Was not the brake-rope perfectly dry at the time of the injury? A. Yes.

"31. Were not four or five stones lowered after dinner on the day plaintiff was injured, and before he was injured, with the same brake-rope that afterward broke, without said brake-rope being wet? A. Several stones were lowered, and no evidence that rope was wet.

"32. Was not the breaking of the brake-rope caused by the burning of it from friction with the journal around which it was wound? A. The breaking was caused by the burning and wearing.

"33. How long would a new brake-rope last upon the work in question if it was kept wet? A. Probably three or four days.

"34. Was it safe to lower rock the distance it had to be

48 — 43 KAS.

lowered on this work without keeping the brake-rope wet? A. Yes, if rope were changed before becoming dangerous."

"36. Was not the rock to be lowered on the work in question lifted from a car on a side-track south of the main track with hooks suspended on a rope and chain from the end of the boom? A. It was.

"37. Was not the rock which fell so lifted? A. It was.

"38. Was not the rock after being lifted from the car swung round, suspended from the end of the boom, until it reached the point where it was to descend? A. It was.

"39. About how far, how many feet was it swung round before it started to descend? A. About forty feet.

"40. Did not plaintiff know that it was dangerous to use the brake-rope if it was not kept wet? A. No."

The *Railway Company* filed its motion for a new trial, which was overruled. Thereupon the court rendered judgment in favor of Fray against the company for $2,000 and costs. The *Railway Company* excepted, and brings the case here.

*A. L. Williams*, and *Chas. Monroe*, for plaintiff in error.

*R. P. Clark*, and *Nathan Cree*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: This was an action in the court below by William Fray against the Union Pacific Railway Company, to recover damages for personal injuries received by him through the alleged negligence of the railway company in failing to properly maintain and safely operate a derrick at Deep Hollow bridge, near a station on the line of the railroad called Tiblow, now known as Bonner Springs. Fray was injured on the 17th day of November, 1882, while engaged as a laborer at a derrick. This action was commenced on the 2d day of February, 1883, and has been in the courts over seven years. It has been here twice before. (31 Kas. 739; 35 id. 700.) When it was first here the case was reversed on account of irrelevant instructions, and the evasive and untrue answers of the jury. The second time it was here it was reversed on account of incompetent evidence, erroneous instructions, and the failure of the jury to answer questions submitted

to them in an intelligent manner. Upon the first trial the damages allowed by the jury were $2,000; upon the second trial, $4,000; and upon the third trial, $2,000.

It is unnecessary to give a full description of the derrick, the ropes and other appliances connected with it, as they are already set forth at length in the reports referred to. In operating the derrick, a rope, called a brake-rope, was used. A portion of this was wound around the pinion-shaft. The rope was of sea-grass, and an inch and a half or two inches in size. While the derrick was being used in moving a large stone, the rope broke, the derrick went to pieces, a portion striking Fray on his face and injuring him severely.

The jury, among other findings, found specially that the breaking of the rope was caused by wearing and the burning from friction with the journal, or pinion-shaft; that the rope was perfectly dry at the time it broke, and that if it had been kept wet where it was wound around the pinion-shaft, it would not have burned. Samuel Mallison was the general superintendent of the construction. William Ulrich was the overseer, or foreman of the work. John Nelson, one of the laborers handling the derrick, testified that about eleven o'clock in the forenoon of the day that Fray was injured he told Ulrich "this brake-rope was about worn in two, and I will have to have more rope." Ulrich answered, "Jack, you are using too much rope—let the rope go." Nelson also testified that at one o'clock in the afternoon of the same day, about an hour before Fray was hurt, he said to Ulrich, "Well, I told you I wanted more new rope." Ulrich said, "Go ahead with the rope you have; you are using too much rope; by God, we expect to kill a man in this place before we are through with it."

R. P. Seagraves testified that on the day of the breaking of the derrick he was working for the railway company, under the direction of Ulrich, at the Deep Hollow bridge; that he heard the conversation between Nelson and Ulrich in the afternoon of the day that the derrick broke; that Nelson said to Ulrich, "We will have to have some new rope—this rope

is about played out." Ulrich replied, "You go ahead with that rope; you are using too much rope." Nelson answered, "It will break the first thing you know, and there will be somebody killed." Ulrich said "he didn't give a —— ——; there would have to be somebody killed before the work was finished, anyway."

James Barrett testified that he heard the conversation between Nelson and Ulrich just before the rope broke, and stated it substantially the same as Nelson and Seagraves.

The contention of the railway company is, that Fray was directed by Mallison and Ulrich to keep the brake-rope and pinion-shaft wet, and that the rope broke because of his negligence. Fray denied that he had any such directions, and claimed that his sole duty at the derrick was to help hoist stone, and receive and give signals. The jury specially found that it was the duty of Fray to give signals when rock was being lowered by the derrick; that at the time of the accident Fray was on the platform giving signals; that neither Mallison nor Ulrich ordered or directed Fray to pour water on the brake-rope, so as to keep it wet; that neither Mallison nor Ulrich warned him that there was danger of the brake-rope burning while rock was being let down, if the rope was not wet, and that Fray was never informed by anyone that there was danger of the brake-rope burning if not kept wet. Upon the trial Fray testified:

"Q. Who put you to work upon the derrick? A. Mr. Ulrich did.

"Q. What did he tell you to do? A. He told me to help hoist stone and receive signals and give signals.

"Q. What else, if anything at all? A. That was all he ever gave me any orders for.

"Q. To help hoist stone and give signals? A. Yes, sir.

"Q. Were you at work on the platform? A. I was.

"Q. Whom did you receive orders from during the work? A. From Mr. Ulrich, the foreman.

"Q. Was he the foreman controlling that work on the 17th of November, 1882? A. Yes, sir; he was.

"Q. What were you doing on that day — what part of the

work were you engaged in? A. Well, just on that day I was helping hoist stone, receiving signals and giving signals.

"Q. How long had you been at work there? A. I disremember just about what time it was; somewhere in September, 1882, when I first commenced work at that place.

"Q. Did you see Mr. Mallison there? A. I would see Mr. Mallison pass along sometimes; he would stop there on the work; I saw Mallison come around there several different times.

"Q. When did you first see him there; do you recollect? A. Well, no; I can't recollect just the first time.

"Q. Was he there often during the time you were at work? A. He would be around there sometimes; he would be there about three times a week, and sometimes less.

"Q. What orders did you hear him give, if any? A. I never heard him give any orders.

"Q. Of any character, whatever? A. No, sir; I never heard him give any orders around in my presence.

"Q. You don't recollect of ever having heard him give any orders in your presence? A. No, sir.

"Q. Who gave you your orders? A. Mr. Ulrich.

"Q. Did you ever receive any orders from Mr. Mallison at all? A. No, sir; he never did give me any orders.

"Q. Do you recollect the orders given you by Ulrich prior to the happening of this, at the time you were there? A. All the orders he ever gave me was to help hoist the stone out of the cars, and to watch for signals, and never leave the platform.

"Q. Do you recollect any other besides them? A. No, sir, he never did; never gave me any other orders.

"Q. No other directions, or no other duties were assigned to you but what you have mentioned? A. No, sir; never did."

There was other evidence tending to support the statements of Fray; and as there was sufficient evidence to sustain the verdict and findings of the jury, we cannot disturb either.

Mallison and Ulrich contradicted Fray and his witnesses. If the jury had accepted their evidence as satisfactory, the verdict and many of the material findings would have been favorable to the railway company. This court has repeatedly stated that if the findings or verdict of a jury be contrary to the judgment of its members, they will not be set aside, if

approved by the trial court, unless there is a total want of evidence.

Further complaint is made, that if Fray was not directed by Mallison or Ulrich to pour water on the brake-rope, he must have known it was dangerous to use the rope without being kept wet, and therefore that the finding of the jury to the contrary is without any support. There is very much in the evidence tending to show that Fray did know, or ought to have known, that it was dangerous to use the rope if not wet, and it is the opinion of the writer that the finding of the jury upon this point is against the preponderance of the evidence. All the evidence, however, was before the jury, and submitted to them under proper instructions, and we are unable to say that the finding is wholly without support. Nelson's testimony, although very unsatisfactory to the writer, goes to the full length of this finding of the jury. There is the presumption that Fray did not purposely incur danger to himself or put his life in peril. It is possible that although he may have thought the rope unsafe for those below the derrick, he did not think it dangerous to himself. The breaking of the rope seems to have been more disastrous to the derrick, the cog-wheels, pulleys, etc., than might have been expected.

Where there is evidence competent to be considered by a jury, and the court submits it for their consideration, a finding or verdict thereon will not be set aside, although the appellate court may be of opinion that the evidence was insufficient to support the finding. (*Railway Co. v. Kunkel,* 17 Kas. 145; *Gafford v. Hall,* 39 id. 166.)

Counsel for the railway company refer to the opinions of this court upon the former hearings, and strenuously insist that the language of those opinions applies with full force to the case as now presented. In this decision we cannot go outside of the record before us. A portion of the evidence introduced upon the former trials was used as impeaching evidence at the last trial and is contained in the record, but all of the testimony of the former trials is not before us. When this case was here for review at the January term for

1884 and at the July term for 1886, the writer of those opinions, in view of the reversal of those judgments for manifest and manifold errors, made comments upon the evidence which it was not really necessary to make and which would not have been made but for the other errors then appearing.

The special findings of the jury are criticised as evasive and conflicting. Under the prior decisions of this court, findings of fact, if supported by sufficient evidence, will be construed so as to sustain the verdict, if such a construction can be fairly given; and all findings are to be harmonized so far as possible. (*Simpson v. Greeley*, 8 Kas. 586; *Railroad Co. v. Phillibert*, 25 id. 483; *Railway Co. v. Holley*, 30 id. 465; *Railway Co. v. Ritz*, 33 id. 404; *Clark v. Railway Co.*, 35 id. 350; *Insurance Co. v. Smelker*, 38 id. 285.)

There was no material error in refusing the instruction about the revocation of the order of Mallison to Fray to wet the rope, because the jury found that no such order was ever given.

The instruction for the jury to find the facts according to the testimony of Mallison was properly refused, because his evidence conflicted with that of Fray and his witnesses.

As to the liability of the railway company upon the verdict and findings, we refer to *Railroad Co. v. Salmon*, 14 Kas. 524; *Railroad Co. v. Holt*, 29 id. 152; *Railroad Co. v. Moore*, 29 id. 633; *Railroad Co. v. Fox*, 31 id. 586; *Railway Co. v. Mackey*, 33 id. 298; *Railroad Co. v. Wagner*, 33 id. 660; *Railway Co. v. Weaver*, 35 id. 412; *Railroad Co. v. Dwyer*, 36 id. 58; *Railroad Co. v. McKee*, 37 id. 592; Gen. Stat. of 1889, ¶¶ 1250, 1251, and cases there cited.

The judgment of the district court will be affirmed.

All the Justices concurring.