## Hardin Taylor *v.* John Clendening.

### *Error from Bourbon County.*

The refusing or granting leave to amend pleadings is a matter within the sound discretion of the court, and a decision on an application therefor will not be disturbed, unless there is manifest abuse of discretion.

Evidence of "common reputation," "general character" and "general reputation" of the plaintiff below—a witness in his own behalf, *held,* properly excluded, in an effort to impeach the evidence; *held,* that the impeaching evidence was properly restricted to character for truth and veracity.

"Allegations of value or of amount of damages shall not be considered as true for failure to controvert them " in the pleadings. [Civ. Code, § 137; amended Comp. L., 236, § 2.] *So held,* in an action for damages, growing out of an assault and battery, where the court below charged otherwise, and where the record clearly showed the damages to have been less than as plead.

But the jury having found a verdict for less than the amount claimed in the petition, *held,* that the defendant below was not injured by the error.

In such action, where the evidence shows previous threats by plaintiff against the life of defendant below, the vigorous use of fire-arms, perhaps on both sides, and was conflicting as to which party was the original aggressor and made the first assault, *held,* error for the court to instruct the jury substantially that, if the jury should find from the evidence that the plaintiff committed the first assault, yet, if they should believe that the defendant had used more force than to a reasonable man would seem necessary to defend himself from being harmed by plaintiff, and in so doing shot the plaintiff, then they must find for plaintiff.

*Semble,* though the charge would be nearly correct in a case where the State was the prosecuting party, for the disturbance of her peace, in which case the unnecessary force in the defense would be a public offense against the public peace;

But the instruction assumes that the plaintiff was the original aggressor, and if so, where he sues for damages on account of injuries received in the affray, it is not for him, who has met too vigorous a defense, to recover damages of his intended victim. A person must be allowed some latitude in defense of his life.

In addition to the statement of facts in the opinion of the court, it may not be improper to add:

That the record shows that the application on the part of the defendant below, for leave to amend his answer, was first made after the jury had been impanneled and sworn, and "the parties had stated their cases to the jury," and no showing was made on the application; and the plaintiff below offered to allow the amendment on payment of costs. The testimony of the parties, each in his own behalf, is as follows:

John Clendening, being duly sworn, testified as follows: "I am the plaintiff. In February, 1866, I resided in Bourbon county, about one and one-fourth miles from the Missouri state line. About the 26th of that month I left my house to go to Richard Meeks's, to get an ox-yoke; rode a mule; left home about 9 o'clock A. M. Defendant lived in Missouri, near the state line. Soon after getting into Missouri, I saw the defendant off to my left, quite a distance. I was going east; he was going southwest. After riding a quarter of a mile further, defendant rode up behind me in the road. Heard his horse coming at a good speed, and I hurried my mule. He called out to me and said 'old man,' or something of that kind. I turned and looked back, and saw him. He had a pistol in his hand, and was making motions, and said something about my taking back something I had said. I had no weapon of any kind. He shot, and hit me in the hand; he then shot again, and hit me in the left breast. I was facing him then, but must have been a little quartering; he was distant about twenty feet. After the second shot defendant rode off toward McNeil's. When he fired we were about two hundred yards from defendant's house. I saw defendant's wife close to his

house. The ball has never been extracted from my breast. The wound bled considerably. I suffered a good deal of pain ; was confined to my house a little less than three months. I had a physician—Dr. Clevenger; he visited me only once ; I paid him for that visit; can't tell how much. Another doctor—Dr. Baird—came to see me once ; he came as a neighbor ; he came only once, and his bill was nothing. I still have pain in my left shoulder; when I work it gets sore some. It was three months before I did any work. It was very painful; could not sit up for about three weeks. My anguish of mind was so great I could not sleep nights. My family sat up with me nights for about three weeks. Don't know where the ball is ; think it is under the shoulder. I still continue to suffer in consequence of the wound. Am forty-seven years of age."

On cross-examination, the plaintiff testified : "I took no revolver with me, as the belt was gone ; my son had taken it. Don't think I saw or talked with my sons, or with McFarren, as I was going over. Did see them and talk with them when coming back. Defendant came up behind me on a cross-road. When he said, 'Hallo, old man,' I told him he could not scare me. At the time of the shooting I suppose my mule was headed toward defendant, as I was facing him ; mule was moving toward him when he first fired.

"A few nights before this occurrence, I went down to defendant's—partly to prevent a row, and partly to talk with him about stories about us. My sons and McFarren went with me ; don't recollect whether I had a revolver or not; my son James did have one. Defendant was not at home ; inquired for him ; did not threaten to take his life.

" I got laudanum and medicine from Dr. Clevenger ; he visited me professionally only once."

The evidence of Hardin Taylor, in his own behalf, was as follows : "I resided in Vernon county, Mo., on 26th February, 1866 ; about two miles east of plaintiff's. Saw plaintiff about that time, between fifty and sixty yards from my house ; it was about 9 A. M. Plaintiff was in the highway, going east, between his house and mine. I had been hauling saw-stocks ; had unruly cattle, and had ridden from the highway to cut a hickory ; was on the north side of the highway ; after getting hickory, started back to the road, and saw Clendening directly in front of me ; I was thirty or forty feet from him ; I was on horseback ; he was riding a mule. Plaintiff said to me he had a 'coming over' for me. I replied, 'we had just as well have it this morning as any time.' Plaintiff then drew his pistol and shot at me without saying anything. His pistol was drawn from his left side. He did not hit me. I then shot at him with a revolver. Plaintiff then spurred his mule and made towards me, and then turned away. I shot twice ; plaintiff shot once. Shooting took place fifty or sixty yards from my house. My house was plainly in view of the place where the shooting was. One of my boys was with me before I saw Clendening ; when I rode out after the hickory, he went on with the team. My other son was at the house when the shooting took place. After the shooting, plaintiff rode west, towards his house, and I went home.

" A short time before this occurrence I learned from my family that plaintiff and his son, and McFarren, had been to my house, and had made threats against me. I learned that plaintiff had threatened my life ;

he swore, at my house, that he would kill me, or have me killed. I learned these facts from my wife, daughter and son."

*Cross-examined.*—"I saw plaintiff draw his pistol from his left side; did not notice any belt. Plaintiff was then in the road; I was forty or fifty feet from the road, to the north. Thirty feet was the closest I was to plaintiff."

*Re-examined.*—"When we were closest, plaintiff was out of the road six or seven steps. He turned his mule partly toward me when he shot at me, and when I shot he spurred toward me; and when I shot again, he turned clear around to the west and rode off. When I shot at him (the first shot), he motioned as though he would shoot again at me, but his pistol did not go off then."

The plaintiff, recalled, testified:

"I was at Taylor's house at the time stated; also my son and Stokely McFarren. No threats were made by us. I told Mrs. Taylor about the horse-stealing stories about my sons; that they were all lies, and I wasn't going to stand it any longer. The shooting was done at least two hundred yards from Taylor's house. It was about three-quarters of an hour from the time I left home in the morning until I returned, shot. Stopped nowhere on the road, going or coming, except only as I called at Mrs. Allen's door, coming back, to have her send for my daughter. Did not get off my mule until I got home."

Other evidence was given, corroborating each.

The court, among other instructions, gave the following:

"That under the pleadings in this case, to make a defense it was incumbent on the defendant to establish

the fact that the plaintiff committed the first assault; and the further fact that the acts of the defendant, in shooting the plaintiff, admitted in his answer, were done necessarily in self-defense, and that unless the jury should find these facts from the evidence, they must find for the plaintiff.

"That the averment in the petition, that the plaintiff 'was compelled to pay one hundred dollars for medical attendance,' not being denied by the answer, is admitted as true ; and if the jury should find for the plaintiff at all, they must assess his damages at not less than one hundred dollars."

And at the request of the plaintiff, the court also instructed the jury that "if they should find, from the evidence, that the plaintiff committed the first assault, yet, if they should believe, from the evidence, that the defendant had used more force than was necessary to defend himself, and, in so doing, had shot the plaintiff when it was not necessary for him so to do, and when it would not, to a reasonable man, have appeared necessary for him so to do to save himself from being harmed by plaintiff, then they must find for the plaintiff."

The verdict was for plaintiff, for $35. A motion for a new trial was made, and from the order refusing it, the case is brought to this court.

*W. C. Webb*, for plaintiff in error.

*M. V. Voss*, for defendant in error.

*Webb* submitted :

1. The court below erred in refusing to allow the

amendment proposed to the answer. The proposed amendment was a "general denial." The right to amend a pleading, at any time before the trial is concluded, is expressly given by statute. (*Civ. Code*, §§ 141, 142; *Fox River R. R.* v. *Shoyer*, 7 *Wis. R.*, 365, 371; *Egbert* v. *Wicker*, 10 *How. Pr. R.*, 196, ¶ 2; *Miller* v. *Garling*, 12 *id.*, 203.) If the adverse party alleges that he is "misled to his prejudice," he must prove that fact "to the satisfaction of the court," and "in what respect." (*Code*, § 141.) In Marley v. Smith, the proposed amendment set up "new matter;" and the court held that, "without an explanation of laches," such new matter might, "perhaps," work injustice to the plaintiff.

2. The court erred in refusing to permit the defendant to prove the "general character," the "common reputation," and the "general reputation," of the witness, Clendening. It will be contended that the question should be limited to his reputation "for truth and veracity." On this question there is a conflict of authority. But the correct rule is stated in The State *v.* Parker (7 *La.*, 83), where it was held that "testimony as to the general bad character, without limiting the questions as to character for truth and veracity," was properly received. (2 *Liv. L. Monthly* [1854], *p.* 595; *Wilson* v. *The State*, 3 *Wis.*, 798; 4 *Phil. Ev.* [3*d ed.*], 754, *note* 388.) The evidence offered was also competent, as tending to show the inducement and provocation, and urgent necessity for prompt action on the part of the defendant. 1 *Hil. on Torts*, ch. 5, § 11.

3. The court erred in the instructions given to the jury. *a.* The second instruction was erroneous, because the plaintiff had proven conclusively that his liability and disbursements for medical attendance did

not exceed "thirty dollars." *b.* The third instruction was given as asked by the plaintiff below. It assumes that the jury might find that the plaintiff committed the first assault, but that the defendant went beyond necessary defense. The testimony of two witnesses shows that the plaintiff made the first assault, drew his revolver, and shot at the defendant, whereupon the defendant drew his revolver and shot the plaintiff. "The blood had not time to cool." The provocation and assault by the plaintiff, and the retaliatory assault by defendant, formed parts of one transaction. The question of "apprehended danger," "necessary resistance," and the like, did not and could not arise in this case, and the instruction was erroneous. 1 *Hil. on Torts,* ch. 5, §§ 11, 14, *note b.*

*Voss,* for defendant in error, contended :

1. The court did not err in refusing the amendment. No merit or explanation of laches was shown. *Smith* v. *Marley, Sup. Ct., Jan. Term, A. D.* 1867, *ante.*

2. The defendant did not specify what reputation he was desirous of proving. Reputation for truth only was admissible. 11 *Ills. R.,* 378 ; *Henry & Reed's Ills. Digest,* 380 ; 18 *Vt.,* 162 ; 2 *McLean,* 219 ; 27 *Cal. R.,* 362 ; 4 *Ohio S.,* 668.

*By the Court,* BAILEY, J.

This cause, which comes up on error from Bourbon county, was an action by defendant in error, against plaintiff in error, to recover damages for an assault and battery, by shooting, to which the defendant below, now plaintiff in error, answered that the plain-

tiff below, now defendant in error, made the first as-
sault, and shot first; and that the shooting of which
plaintiff complained, was done in self-defense. The
plaintiff replied, denying that he made the first assault,
and the cause was tried by a jury, with much contra-
dictory evidence, and some attempts at impeaching
witnesses; and a verdict was given for the plaintiff be-
low, for the sum of thirty-five dollars and costs.

The plaintiff in error complains that the court below
erred in refusing to allow the amendment proposed to
his answer. The original answer admitted the assault,
but excused or justified by alleging that plaintiff made
the first assault.

On the trial, the defendant proposed to amend by
adding to the answer, at the end thereof, the following:
"And saving and excepting as aforesaid, the defendant
denies each and every allegation, matter and thing in
the plaintiff's petition averred," but made no showing
why he should have leave to amend.

The granting or refusing leave to amend, is a matter
within the sound discretion of the court which tries the
cause, and, except in a case where such discretion was
manifestly abused, this court can never interpose.
Such abuse of discretion is not manifest in this case.

Another alleged error was in the court below refusing
to permit the defendant to prove the common reputa-
tion, general character and general reputation of the
witness, Clendening (the plaintiff), and restricting the
witness as to character—to the character for truth and
veracity.

We think the ruling of the court below was correct
on this point, and supported by an immense prepon-
derance of authority.

But, in the instructions to the jury, there was, we

think, manifest error. The second instruction was that, "the averment in the petition, that the plaintiff was compelled to pay one hundred dollars for medical attendance, not being denied in the answer, is admitted as true, and if the jury should find for the plaintiff at all, they must assess his damages at not less than one hundred dollars," was certainly wrong, since the same section of the code (§ 137) which lays down the rule that "allegations in the petition, not controverted by the answer, shall be taken as true," also declares that "allegations of value, or of amount of damages, shall not be considered as true, by failure to controvert them."

And besides this, the plaintiff himself had proved that his disbursement and liabilities for medical attendance did not amount to one-half of a hundred dollars. Still, as the jury must have disregarded this instruction of the court, since they assessed the plaintiff's damages at barely thirty-five dollars in all, we cannot see that the plaintiff in error is aggrieved or injured by this error of the court.

But the third instruction must also be deemed erroneous, and we cannot say that it was harmless. It was given in these words, at the request of the plaintiff below: "If the jury should find, from the evidence, that the plaintiff committed the first assault, yet, if they should believe that the defendant (plaintiff in error) had used more force than was necessary to defend himself, and in so doing had shot the plaintiff when it was not necessary for him so to do, and when it would not, to a reasonable man, have appeared necessary for him to do so to save himself from being harmed by plaintiff, then they must find for the plaintiff." This instruction might have been very nearly

correct, had the State, instead of the original assailant, been the prosecuting party. But in this case it was not the State seeking to punish the disturber of her peace, and thus vindicate her offended laws; but the plaintiff sues for damages as compensation for injuries suffered in an affray in which firearms were used by one party, and perhaps by both.

The two principals in the conflict with firearms are placed upon the witness stand, and swear against each other, as earnestly as they fought. And each is supported and corroborated in his statements by the testimony of one or more of his children.

The testimony is conflicting; and it is difficult for us to avoid the conclusion that one or the other of the principals swore falsely, and knew that he did so. On one side it is claimed that the plaintiff was attacked without cause or provocation, and shot in the left breast, with a revolver. On the other side it is asserted that the plaintiff himself made the first assault, and fired the first shot.

Now, it seems to us that if the plaintiff was, in truth, an aggressor, and made the attack upon the defendant as alleged, with deadly weapons, and in pursuance of previous threats to kill the defendant; and if, under those circumstances, the defendant had, in self-defense, discharged his revolver at his assailant once or twice more than was necessary, it would not be for the plaintiff, who had made the assault, and had met with a repulse, to transfer his cause from the field to the forum, and recover damages of his intended victim for making a too vigorous and successful defense. Yet this seems to us to be the effect of the instruction in question. It assumes that the plaintiff was the assailant, and

then instructs, in a certain contingency, to mulct the defendant in damages for his benefit.

We do not think the law could furnish a healing-plaster for his wounds in the case supposed. In that case he was the original transgressor. The law had been outraged, but he had not. The unnecessary force and violence was an injury to the public peace, for which the defendant might be called to answer to the public, but not to him. He cannot undertake to wreak a lawful vengeance upon his antagonist—pistol in hand—and, defeated, sue him for damages to the person, upon the basis of the instructions. He must run his own risk. Nor would it be an easy matter for the party, attacked in the manner narrated in the testimony of the defendant, to act with all the deliberation the instruction would seem to require. In the heat of blood he could hardly be expected to weigh his words or to measure or count his blows or shots very carefully. "All that a man has will he give for his life," and a man thus attacked must be allowed some latitude in defense of his life.

Judgment reversed. Cause remanded for a new trial. All the justices concurring.