KANSAS PACIFIC RAILWAY CO. v. JEROME KUNKEL.

1. AMENDMENTS; *Discretion of Court.* Granting leave to amend a petition is a matter largely within the discretion of the trial court, and it must appear that such discretion has been abused before a reversal will be ordered.

2. ———— *Allegation of Time; Limitation of Action.* Granting leave to change the date at which a matter is alleged to have taken place, shows no abuse of discretion, although by the former date the action was barred, and by the latter not. In this case it does not appear that under any pretense of amendment, a cause of action not barred was substituted for one barred; and the court may look at the whole record to determine that question.

3. ACTION, NATURE OF— *Whether Ex Contractu, or Ex Delicto.* A petition which alleges that the defendant is a common carrier, that it made a certain contract of carriage with the plaintiff, receiving its pay therefor, that plaintiff entered upon its cars in pursuance of such contract, and that defendant, in violation of its contract, did not stop at the place to which it had agreed to carry him, but carried him some distance beyond, and then by a sudden starting of its train threw him down and injured him while attempting to get off the train in obedience to its orders, states a cause of action arising *ex contractu.*

4. CREDIBILITY OF WITNESS; *Interest; Instructions.* While it is true that interest affects the credibility of a witness, and it is proper that the court in its charge should call the attention of the jury to that fact, yet where it has done so in its general charge, and has also at the instance of one party given a special instruction to the same effect, it is seldom error to refuse an additional instruction asked by the same party stating the law in stronger and more emphatic language.

| 17 | 145 |
| 40- | 65 |
| 40 | 525 |
| 17 | 145 |
| 41 | 492 |
| 17 | 145 |
| 43 | 758 |
| 17 | 145 |
| 45 | 416 |
| 45 | 767 |
| 17 | 145 |
| 48 | 216 |
| 49 | 13 |
| 50 | 63 |
| 50 | 724 |
| 50 | 775 |
| 17 | 145 |
| 51 | 704 |
| 17 | 145 |
| 56 | 429 |
| 56 | 641 |
| 17 | 145 |
| 60 | 420 |
| 17 | 145 |
| p70 | 812 |
| 70 | 895 |
| 17 | 145 |
| 71 | 589 |
| 17 | 145 |
| 72 | 48 |
| 17 | 145 |
| 80 | 274 |
| 17 | 145 |
| 81 | 232 |

5. VERDICTS—*When Not Disturbed.* The oft-repeated rule of this court, that where there is clear and positive testimony sustaining every essential fact, and the verdict has received the approval of the trial court, this court will not disturb the verdict as against the evidence, although upon the record the evidence seems to greatly preponderate the other way, commented upon and reaffirmed.

*Error from Jefferson District Court.*

ACTION by *Kunkel,* to recover for personal injuries sustained in August 1869. The action was commenced in May 1872. The facts as claimed by *Kunkel,* are stated in the opinion, *infra.* The *Railway Company* pleaded the statute of limitations, and also controverted the facts alleged in the petition. A trial was had in May 1873, when a verdict was returned in favor of *Kunkel* for $3,000 damages. On defendant's motion, the district court, at the same term, set aside the verdict, and granted a new trial. A second trial was had at the May Term 1874. The main defense, upon the merits, was, that the injury complained of by *Kunkel* was not caused as alleged by him, but had in fact existed many years, and witnesses were called to prove that *Kunkel* had been ruptured, and had worn a truss, since 1861. The jury returned a general verdict in favor of *Kunkel,* assessing his damages at $2,500; and they also responded to special questions of fact, as follows:

"*Question:* Was Kunkel ruptured before the 18th day of August 1869? *Ans.:* He was not, where he now wears a truss; but had what he called ruptured veins in his leg.

"*Question:* Did Kunkel get off from the cars of defendant, and receive the injuries, if any, of which he complains, while the cars were in motion, and before they had come to a stop? *Ans.:* The train had stopped; by order of the conductor plaintiff attempted to alight, and in so doing, by a sudden motion of the train, plaintiff was thrown from the same, and received the injuries of which he complains.

"*Question:* Did the injury complained of occur upon a dark night, and was it so dark that plaintiff, when he left the train and sustained the alleged injury, could not see where to step or place his foot in safety? *Ans.:* It was dark, as stated.

"*Question :* Did the conductor tell plaintiff that the train could not stop at Medina? *Ans.:* Not when·he collected the fare; but after the train had passed Grantville.

"*Question :* Did the conductor tell the plaintiff that he must get off at the water-tank when the train stopped? *Ans.:* No, but said he would run down to the tank; but stopping before he got there, he told him to get off. .

"*Question :* Did the train stop at the tank? *Ans.:* It does not so appear in the evidence.

"*Question :* Was the train a freight train? *Ans.:* It was, with a passenger coach attached.

"*Question :* Did the plaintiff get off before the train stopped at the tank? *Ans.:* He did."

The *Railway Company*, on these findings, moved for judgment *non obstante.* Motion overruled, and judgment for plaintiff on the verdict. New trial refused, and the *Railway Company* brings the case here on error.·

*J. P. Usher*, and *E. W. Dennis*, for plaintiff in error:

Kunkel filed a petition in May 1872, alleging a contract of carriage with the company of himself as a passenger *on the 20th March 1869.* He averred that he was to be carried from·Topeka to Medina for the sum of *three* dollars paid to the company, and he alleged a breach of the contract, and injury. The summons was issued on 7th June 1872, and was duly served. By the code, § 20, the suit was commenced on said 7th of June. As the cause of action accrued on the 20th March 1869, the action was barred by the statute; (Code, § 18.) In November 1872, leave was granted Kunkel to amend his petition, which he did, alleging another and different contract of carriage between himself and the company, made on the 18th of August 1869, whereby he was to be carried from Topeka to Medina for the sum of.*one* dollar, which was then paid. There is no allegation in the petition that the causes of action in the two petitions were identical, and so far as the petition shows the causes of action are other and different—one laid in March, and the other in August, in the same.year, and for different considerations.

Did the court below err in allowing Kunkel to set up an-

other contract than that upon which he had sued, and so have the benefit of his summons issued on a petition which was a nullity, and stated no cause of action? The petition being a nullity, no suit was in fact commenced. The summons performs the office of a subpœna in chancery, upon the bill being filed. If the bill states no cause of action, another cannot be filed and hold the defendant to answer under the subpœna. The summons in this case is dated within three years after the date of the alleged August contract 1869, but which contract was not sought to be enforced until more than three years thereafter, to-wit, in November 1872. It is to be decided, then, whether without allegation other than is contained in the two petitions, the second is an amendment of the first; and we submit that a fair test whether it was an amendment would be if Kunkel had in the first instance filed a petition setting up both causes of action in separate paragraphs, before the statute of limitations had run upon either cause of action, and the company had insisted at the trial that Kunkel could give in evidence only one contract and one injury, the company would fail in its objection; he could give in evidence as many causes of action as he had alleged. In this case there is no circumstance leading the mind to suppose that the alleged contracts were one and the same, except that they were between the same parties, and the carriage was to be over the same ground; while on the other hand, the compensation was different for the performance of each contract, and five months elapsed between them.

The company was a common carrier of passengers, operating its trains each day over its road between Topeka, and passing Medina east. Kunkel himself testified that he "had been carried by before," that is to say, past Medina; "they had carried me down to the tank frequently, before that." In his petition he does not state whether he was being carried by night or by day; and it was only upon the trial that he informs us it was by night, and during a violent storm of wind and rain. From his own testimony he had an indefinite range of time in which to designate the time of the injury

complained of. It appears that he was often carried over the road, and it does not appear that any of the servants of the company or the company itself, heard or knew of his alleged injury until he sued. This is important, because he does not testify that he received but one personal injury, though he does testify that there were frequent breaches of contract before the time he received the injury complained of. If Kunkel testified truly, he had many causes of action for breach of contract in carrying him past Medina. The gist of the action, in both petitions, is, the carrying him by that station; all that he alleges about injuries goes to the increase of damages, and if injuries were not proved, he could still recover for the breach of contract at least nominal damages. Taking his testimony and first petition as true, and there was a breach of contract as early as March 20th 1869. If he had been carried only once by the company, and if upon such carriage his limbs had been broken, or had suffered the loss of any member of his body, and such fact had appeared, there would be more reason for calling the second petition an amendment of the first, if they had described the contract and injuries the same. In this case it is earnestly contended that there is no room to suppose that the second petition was for the identical cause of action as the first. It would be as fair and reasonable to hold that where suit is brought upon a note barred by the statute of limitations, on objection made, plaintiff might lawfully file a new petition on another note, not barred by the statute.

But we submit, whether it is legally true, as claimed by Kunkel, that the *gist* of the action is the "breach of the contract" in carrying him past the station? We suggest that reflection and examination will show that the gist of the action was *tort*. For, after alleging the contract of carriage to Medina, the petition states that the defendant refused to stop its carriage at Medina, but carried Kunkel more than a mile past, and then ordered him to get down from the carriage, and while he was attempting to obey the order the defendant violently and suddenly started the carriage with *great force*,

*threw the plaintiff down from the carriage to the ground and wounded, bruised and beat him.* It is submitted to the better judgment of the court, whether this is not an action *ex delicto,* whether the gist of the action is not the *wanton throwing down to the ground, beating, bruising and wounding Kunkel.* The injuries complained of do not necessarily or naturally flow from the breach of contract in carrying Kunkel past Medina. The allegations of contract and breach were but inducements to the cause of action for the alleged assault and battery. There is no allegation that the contract of carriage was negligently or carelessly performed, as in *Howard v. Ritchie,* 9 Kas. 102, or in *Staley v. Jameson,* 46 Ind. 159.

2. The answer of the defendant, is, first, a general denial; second, an averment that the first petition in this cause, filed May 11th 1872, was for another and different cause of action than that complained of in the second petition. This paragraph tendered an issue as to whether there were two causes of action. Kunkel replies to this second defense, averring that the causes of action were the same in both petitions, and gives a reason why they were not described in the same way in both petitions, that his attorneys were ignorant of the date of the commission of the injury. The question here is, upon whom was the burden of this issue? If upon inspection of the two petitions the legal conclusion is that they describe the same cause of action, and that a recovery upon one of the petitions could be pleaded in bar of the second, then the pleadings raise an immaterial issue. It is not believed that any such conclusion can be reached, and we proceed to discuss upon which party devolved the maintenance of the issue. If it had appeared by the petition, as it ought, that there never had been but one cause of action, and that the contract was made in August, instead of March, and if a petition containing such averments ought to have been received as an amendment (which is denied,) then, upon the general denial by defendant, the burden of the issue would have been upon Kunkel. The paragraph in the answer alleging that the petitions were not for the same cause of action, concludes by an

appeal to the records for the proof, all of which appears by the record in the cause. Not an issue tendered to the country, but to the court, to be adjudged by the record. The reply tenders an issue necessarily to be determined by other than record evidence. Upon that issue no proof whatever was offered other than Kunkel's own testimony that he had been carried by frequently before, so that if there was any evidence upon that issue it was against Kunkel. What then is the condition of the case? This court must determine that upon the face of the two petitions; they are for one and the same cause of action; if not, then that. Kunkel failed to prove the issue by him made. In every phase of the case it appears and will appear that unless this court shall find as a question of law that the petitions were for one and the same cause of action, and that judgment upon one, for or against the company, would upon the record bar an action on the other, if pleaded, error was committed, and the judgment ought to be reversed.

3. If the foregoing objections are not well taken, it will become necessary to consider other alleged errors. Attention is called to the 7th instruction asked by defendant. The 6th instruction given by the court, and substantially repeated in its own instruction, is not an equivalent for the 7th instruction refused and excepted to. The 6th instruction simply affirmed the interest of Kunkel in the case, and that his credibility was in question, and that such witnesses may be more readily suspected of prevaricating or testifying falsely in their own behalf than witnesses who have no interest in the case. The 7th instruction was intended to carry the mind of the jury beyond the domain of the former instruction; it was to remind them of their duty to reconcile if possible the testimony of witnesses so as to make them all testify truly, and to direct their attention to the rule of law that if there was an irreconcilable conflict in the testimony of the witnesses, and that Kunkel's testimony was in conflict with that of disinterested witnesses, the presumption of law was that he had been influenced by his interest to speak un-

truly, and that the disinterested witnesses were entitled to
the confidence of the jury. The law as laid down by this
instruction has been at all times recognized before parties
were made competent witnesses. (See Sharswood's Starkie
on Evidence, p. 869; 35 Ind., 543.) The instruction sup-
posed the case of irreconcilable conflict in the testimony of
witnesses. In such case the jury are bound to decide the
fact to be as testified by·the one or the other class of wit-
nesses. In deciding that the one class has testified the truth,
they necessarily affirm that the other has testified falsely.
When such a state of case exists, it becomes the duty of the
court to instruct the jury thereon, and to give them in charge
the rules of law applicable to such state of the case, which
the court in this case, in any form or manner, refused to do;
and we are now to see whether in fact the evidence was of
such a character as to require the instruction: Kunkel in his
testimony, and for the purpose of enhancing his damages,
testified that in getting off the train he was ruptured; that
he thought a peg was run clear through him; that he had
worn a truss ever since; that he could not ride on horseback,
because of the rupture. This was the only permanent injury
of which he complained. *Whether he was ruptured or not, in
getting off that train*, was in the highest degree material. Dr.
Buckmaster, a physician and surgeon for thirty-eight years,
a witness for the company, testified that himself and Kunkel
were members of the state legislature, and roomed together
at Topeka during the session of 1861. That one morning
before Kunkel was dressed, and when he was sitting on the
side of his bed, he said his "truss was out of order." The
doctor was in the middle of the room, in a chair, putting on
his boots, and looking around saw Kunkel arranging his
truss; saw the truss, and saw him apply it where he had then
just shown witness he applied his truss. Dr. G. W. Hoge-
boom testified that Kunkel said, in 1861 or 1862, at time
the 11th Kansas Cavalry was mustered into service, that he
(Kunkel) "was fearful he could not pass an examination on
account of being ruptured." And Thomas Kirby testified

that Kunkel told him, in a conversation about his being out of the army in 1864 or 1865, that he did not go with his regiment to the field because of "his *bad rupture;* that he could not ride horseback; that he had to leave after his regiment was mounted." Capt. Johnson testified that Kunkel told him that he had been ruptured, prior to 1869, and had to wear a truss on account of it. . Kunkel, recalled in his own behalf, testified that he never had any such conversation with Dr. Buckmaster; that he had never worn a truss at that time, and never had one in his hand. And then he goes on to try and prove that Buckmaster was mad at him, and had threatened him for voting against Parrott for the senate, and this to induce the jury to believe that Buckmaster was a prejudiced and false witness. He admitted the conversation with Hogeboom, but said that he had reference to some ruptured veins on his leg, and then he exhibited his leg to the jury. As to Kirby, he admits the talk with him. He says he was hurt by being thrown forward on the saddle in 1868; that he then bought a truss, but as the injury did not prove to be a rupture, he never wore it; that he never wore a truss, and never had a rupture except the varicose veins on his legs, before 1869. He flatly denies and contradicts Capt. Johnson's testimony. Thus it is seen from the testimony, that upon this material question of rupture, which caused the jury to find the large damages against the company, there was a direct and irreconcilable conflict of testimony between Kunkel on his part, and *four disinterested witnesses* on the part of the company. If the 7th instruction had been given, which was the only instruction asked upon such conflicting testimony, it is incredible that the jury would have found as they did.

There is no question of the importance of the testimony of Kunkel upon the subject of his rupture; if he was not ruptured as he declared, his damages ought only to have been nominal. If he was simulating, and setting up his old rupture, and the jury had so believed, it is hard to suppose that they would have given him more than nominal damages; that they ought to have so believed and found, the testimony of

11—17 KAS.

the four witnesses fully establishes. And when the rule of law adopted by this court is considered, viz., *that the court will not reverse the judgment of the court below, because the verdict is against the weight of evidence,* though they decide as in the Salmon case, that the court erred in not giving a new trial, the importance of the trial court giving every instruction asked, tending to lead the jury to a right conclusion, cannot be overestimated. Upon the irreconcilable conflict of the testimony, the company was entitled to that instruction. Considering the injustice of the verdict, if the company had asked no instruction thereon, it was fairly within the duty of the court in some form and manner to have called the attention of the jury to their duties, in determining to which class of witnesses credit should be given, whether to Kunkel, or the four witnesses against him. Kunkel's pretense that his varicose veins were a rupture, was a wicked subterfuge. He took upon himself on the trial the burden of swearing down four disinterested witnesses. When he assumed that task, and performed it as he best could, the company had the right to an instruction from the court, that if they could not reconcile his testimony with the four adverse witnesses, then, the presumption of law was, because of their disinterestedness, that Kunkel had testified falsely. And much more was the company entitled to some such instruction, when the conflict was between one interested and four disinterested witnesses.

4. In many well-considered cases in this court, it has been decided that where the evidence was conflicting, and there was not a great preponderance of evidence against the verdict, this court would not reverse the judgment of the court below for overruling a motion for a new trial, on the ground that the verdict was against the law and the evidence: *U. P. Rly. Co. v. Coldwell,* 5 Kas. 82; *Anthony v. Eddy,* 5 Kas. 127; *Abeles v. Cohen,* 8 Kas. 180; *Ruth v. Ford,* 9 Kas. 17. In *Hyde v. Bledsoe,* 9 Kas. 399, where the trial was by the court, it was said by Valentine, J., that the supreme court would not disturb the finding, unless clearly against the

weight of evidence. It has always been held that a finding of facts by the court is equivalent to a verdict of a jury. So held in *Ruth v. Ford*, supra, citing *Walker v. Eagle Manf. Co.*, 8 Kas. 397. In the case in 8 Kansas, it is said, "It is possible to conceive of cases where the preponderance is so great that we should feel called upon to interfere." It has always been understood by the bar, that in a gross case where the verdict was clearly against the evidence, the judgment upon it would be reversed. Hence the inflexible rule, that the record must show that it contains *all the evidence* in order to bring the question before the court. But in Stanford's case, 12 Kansas, it is said that "as there was some evidence to sustain every material finding of the jury, the supreme court cannot, after it has been approved and sustained by the court below, set it aside"—at the same time affirming that it would have been proper for the district court to have set the verdict aside, because it was not sustained by sufficient evidence. While in the Salmon case (14 Kas. 528) this court goes a bowshot beyond, boxes the compass, and says: "This case was fairly tried in the court below, as far as the judge had anything to do with it, except possibly that he ought to have granted a new trial, because the verdict of the jury was not sustained by sufficient evidence. *The jury made the principal mistake that was made in the case, in finding a verdict for the plaintiff against the weight or preponderance of the evidence.* The verdict ought probably to have been set aside by the court below, and a new trial granted for this reason. But as the court below sustained the verdict, and rendered judgment thereon, thereby presumptively approving the verdict; and as there was evidence to sustain the verdict in every essential particular, we cannot now reverse the judgment merely *because the verdict does not seem to be sustained by sufficient evidence.*" These decisions were against railroad companies, but the rule of law cannot be varied because of that. Other parties must smart as well. The decisions in these cases, undisguised by words, in effect declare that in the opinion of the supreme court flagrant injustice was done; and if adhered

to by this court, the result will be that unpopular suitors will be utterly deprived of the fair administration of justice, as some evidence, false or true, may always be found in support of an unjust demand. If the trial court and jury are not responsible to this court for their decisions in respect to the evidence, there is an end of justice to railroad companies. It is as well known that railroad companies cannot obtain fair verdicts, as it is that the light of day proceeds from the sun; and if this court will not grant a new trial for the error now in discussion, their condition is hopeless. The district judge after a long trial, even if he is without prejudice, universally responds to a motion for a new trial, "The case is to be carried to the supreme court anyhow, and if any errors have intervened, the supreme court will correct them." It is rare that the court below grants a new trial because the verdict is not sustained by sufficient evidence. The decisions in effect make it a matter of discretion, not subject to review; and if the judge participates in the popular feeling, railroad companies are at the mercy of the trial court and jury. We are loth to believe that this court will, upon full consideration, concede that, by the law of the land, it is powerless to do justice in cases of this character. There ought to be some rule of law to prevent such judicial robbery.

If it be not too late, we would respectfully ask the court to abandon its ruling in question, in the Stanford and Salmon cases. We maintain that the court has gone clear outside of adjudicated law, and of the statutes of this state. Sec. 306 of the code provides that a new trial shall be granted when the verdict is not sustained by sufficient evidence, or is contrary to law. Sec. 542 provides that the supreme court may [shall] reverse a judgment of the district court for errors appearing on the record. The oath of the jury (§ 274) is, that they shall give a true verdict according to the law and the evidence. If their verdict is contrary to the evidence, they have failed to abide by the obligation of their oaths, and their verdict is contrary to law. It is hard to understand why a judgment should not be reversed rendered upon

a verdict flagrantly against evidence, while it may be reversed for the admission of improper evidence, which may or may not have influenced the verdict. Courts are instituted for the purpose of attending and seeing that justice is done; and this court exists for no valuable purpose when it finds itself so cramped and hampered by its own rules and decisions, that it is powerless to correct the adjudged errors of inferior courts. And what case, it may be asked, can call for the more certain and positive action of an appellate court than one in which the court finds an unjust verdict has been rendered—an error which goes to the very pith and marrow of the rights of the parties, causing one unjustly to pay or lose money? All other errors are but collateral, and may or may not have led to an unjust judgment. If evidence is rejected which ought to have been admitted, no one can say that it would have changed the result; e. g., if in this case the defendant had produced another witness, and offered to prove by him that Kunkel said he was ruptured before August 1869, and the trial court had upon objection ruled that the witness should not testify, who can say that if he had testified, as proposed, the verdict would have been different? And yet we suppose that the rejection of such evidence would be held an error. In practice, it is not uncommon for the trial court to rule that not more than a given number of witnesses shall be called to testify to a single point. And it may be that such ruling would still be held to be proper. If the allegation of the plaintiff is sustained by himself only, as in this case, and the defendant allowed to call a given number of witnesses to prove the contrary, if the jury arbitrarily find for the plaintiff, the defendant under the present ruling of the court is without remedy, because there was evidence to support the verdict. The failing party is without remedy in the hands of prejudiced court and jury. When the trial court limits the number of witnesses to be called to a single point, it is always supposed to be because the witnesses have established beyond contradiction the fact sought to be proved, and that

it would be a waste of time to multiply witnesses upon that issue, and there is an implied obligation on the part of the court to set aside a verdict found against the testimony of such witnesses; but suppose the trial court does not set aside such verdict, according to the late ruling of this court, if there is one witness whose testimony alone would justify the verdict, this court will not interfere. It all comes to this: that if one witness is found whose testimony taken alone is sufficient to sustain the verdict, though he may be flatly contradicted by a thousand, the injured party is without remedy. We earnestly protest against this ruling. It does violence to the sense of justice of mankind. It is a dangerous innovation upon the former rules and decisions of this court, and of the courts of the other states, and contrary to a sound construction of the statute. By the statute a new trial shall be granted when the verdict is not sustained by sufficient evidence. The sufficient evidence referred to in the statute is not the evidence of the one or the other party, but *all the evidence touching the matter in issue;* and under the statute it can make no difference what party calls the witness. To illustrate: Suppose A charges B in a civil action with assaulting and beating him in the public market, and, upon the trial, testifies that he was so assaulted and beaten by B, and calls none of the witnesses present. But B calls a great number of the bystanders witnessing the transaction, who testify that A commenced the affray, beat B, who made no resistance, but was left prostrate and senseless by the blows of A. Plaintiff and the other witnesses would all be testifying to the same transaction, and it would be the duty of the court to say that the verdict, if in favor of A, would not be sufficient to overcome the testimony of the other witnesses to the same transaction. The meaning of the statute is not that the court below may refuse a new trial, if a witness has testified in such manner as that his testimony taken alone is sufficient to sustain the verdict, but that such testimony is to be taken in connection with all the testimony in the cause. And if the fact is otherwise overwhelmingly proved, no difference by

whose or what witnesses or what evidence, the statute requires that the verdict be set aside; and if the trial court refuses to make such order, the highest office of the appellate court would seem to be to correct the gross wrong.

In this case we contend that the finding of the jury upon the interrogatories are so flagrantly against the evidence with respect to the rupture, as to call for the interposition of this court. The jury found upon the testimony of Kunkel alone that he had not the rupture of which he complains before the 18th of August 1869. He was an interested witness; he told Johnson he was ruptured before that time, and he told Buckmaster and Hogeboom the same thing, and Buckmaster saw him with a truss in 1861, applying it to protect himself against the same rupture of which he on the trial complained. The finding in question is no more nor less than this: the jury, to give a verdict against the railroad company, concluded to hold that the four witnesses of defendant had perjured themselves. Something is due to witnesses who are compelled to testify. Neither of the defendant's witnesses had the slightest interest in the case, and they may justly complain that because they may know some facts important to a railroad company, and are forced to testify, that they are to be stigmatized by the verdict of a jury and held false witnesses upon the oath of a man who is swearing money into his own pocket. It is certain there could be no mistake. Either Kunkel, or they, testified falsely. Are we to believe that Johnson and Buckmaster, Hogeboom and Kirby perjured themselves, or that Kunkel for his own gain did so? All experience shows that neither court nor jury are disposed to give any credit to the testimony of railroad employés. That is exemplified in the Pointer and Salmon cases. It is hard to be made to feel and know that all witnesses testifying favorably to a railroad company are to be at once put under the same ban. Whether Kunkel was ruptured or not before 1869, we have already shown, was in the highest degree material. The record shows that it contains all the evidence, and it remains

to be seen whether by the rules of law any interested witness may swear down four disinterested ones, though it be in a suit against a railroad company.

*Clough & Wheat,* and *D. H. Morse,* for defendant in error:

The amended petition alleged an injury accruing to Kunkel on the 18th of August 1869, which the evidence showed to be the true date—and the objection to the filing of the amended petition was not sustained because the original cause of action was not then and never had been barred by statute, the original petition in the case having been filed May 10th 1872, *less* than three years after the occurrence of the injury sought to be recovered for.

1. The first point, and about the *only* point, that plaintiff in error makes is, that the amended petition was for a new and different cause of action from that set out in the original petition. The only ground plaintiff in error can have for making any such statement is, that in the original petition the injury was alleged to have occurred on the 20th of March 1869, and in the amended petition the injury was alleged to have occurred on the 18th of August 1869. The statement of the real or precise time is not necessary, even in criminal cases, unless it constitutes a material part of the contract declared upon. 1 Chitty Pl. 257, 258; 8 Kas. 211.

2. The court did not err in allowing an amended petition to be filed. In 8 Kas. 211, the petition was amended as to the date of the note sued on. And see *Mo. Valley Rld. Co. v. Caldwell,* 8 Kas. 244; *Davis v. Wilson,* 11 Kas. 74; *Dewey v. McLain,* 7 Kas. 126; 3 Bosworth, 456; 1 Kernan, 368, 373; Code of 1868, §§ 133, 134 and 135, which are identical in language with the sections of the New York code, on which the above decision in 1 Kernan is based. Aside from the cases cited, a comparison of the wording of the two petitions will show they were both for the same cause of action—and that was, that the railroad company, after contracting to safely transport Kunkel from Topeka to Medina, carried him *beyond Medina* and then *forced him to get out* at a time, and place,

and in such manner as that he was *greatly injured.* There is no pretense upon either side of the case that Kunkel was hurt *but once,* and that injury is the cause of action upon which the suit was brought. The *time* at which the injury occurred had no connection whatever with the right of action in the case, except so far as the statute of limitations is concerned — and plaintiff in error at no time complained of being *misled* by the amended petition. On the contrary, plaintiff in error asked and obtained leave "for twenty days' time in which to answer said amended petition."

3. The amended petition takes the place of the original one, and relates back to the commencement of the action, and if the original action was brought in time, then the amended petition was filed in time; 21 How. Pr. 283; 39 Vt. 197; 29 Maine, 108; 33 Cal. 497; 28 Cal. 245. The right of action in this case was not barred until five years from the date of the injury, under the sixth clause of § 18 of the code; and if we are correct in this, then even the amended petition filed November 20th 1872, was filed long before the statute of limitations was a bar to the action. But if we are wrong in this, then certainly the second clause of § 18 of the code covers the case, as an action upon contract, not in writing, and the three-years limitation applies to this case; and the suit being commenced June 7th 1872, less than three years after the date of the injury, the statute cannot be a bar to this action.

4. The petition in error alleges error in refusing to give the 7th instruction asked by plaintiff in error. The instructions as given by the court, presented the case fairly to the jury, and covered fairly and properly all the questions of law in the case, and were quite as favorable for the company as the law would permit. In fact, the 6th instruction asked by plaintiff in error and given by the court, it seems to us goes far beyond what any court ought to say with reference to interested witnesses. It goes fully as far as the case of *Carver v. Louthain,* 38 Ind. 531, cited for plaintiff in error, which is based upon a statute of Indiana, and should be

really no guide whatever to the court in this case.    The 7th instruction was properly refused because it intimates that there was no testimony whatever to support the testimony of defendant in error, which is entirely untrue.    And counsel for plaintiff in error, while gnashing their teeth at the jury, and shaking their gory locks at this court on account of decisions this court has heretofore made in similar cases, seem to entirely ignore the fact, that the jury, who were in this, as in every case, the exclusive judges of the evidence, of its weight, and of the credibility of the witnesses, believed the testimony of Kunkel, and of Elias Gibbs "who slept in the same bunk, and under the same blanket" with Kunkel for eighteen months, and their own inspection of his person rather than the testimony of Dr. Buckmaster, who was the only witness who pretended to swear that Kunkel was ruptured *before* the happening of the matters alleged in the petition.    Although we understand that this court has so often decided that it will refuse to review the findings of fact of a jury where there is any evidence to sustain their verdict, yet we beg to call the attention of the court briefly to the evidence in the case: Kunkel swears positively that he was then and there ruptured — that he fell "on the end of a tie or on a peg."    He says, "It struck me in the groin, and hurt me very much. * * When I was first hurt I thought a peg had run clear through me.    It was very sore for several days.    When the fever went down I found I was ruptured.    I have worn a truss ever since.    I have to wear it at all times, except when lying down."    On cross-examination, he said, "*I am hurt here*"—(standing up and showing the truss in position on his person.)    "I received the injury that night, and have had to wear a truss ever since."    Louis Lutt was with Kunkel at the time, and he testifies: "When I came up to Kunkel he was lying on the road.    He lay there 5 or 10 minutes, then we started for my house.    I went to my store and left him in bed," etc.    Elias Gibbs was first-lieutenant of the company of which Kunkel was captain — they tented together for eighteen months — they slept in the same bunk —

they slept under the same blanket. He testified, "I have seen him dress and undress many times; I have seen him naked, and wading in the water, but I never saw him with a truss on, and never knew of his having any. I remember particularly once in 1863, when we were about wading a stream. He was naked then, except his shirt; he was on foot; it was in the day time." And this it must be recollected was in 1863, two years after Dr. Buckmaster saw (as he said) Kunkel adjusting a truss in his room at Topeka. That Kunkel was hurt in August 1869, at the time alleged in the petition, there is no dispute. *How* he was hurt and the *extent to which* he was hurt, were the questions in controversy. Kunkel swore positively on these points. Louis Lutt corroborates Kunkel fully; he shows Kunkel was injured so much that he had to sit down several times before he got to Lutt's house — that when he arrived at Lutt's house he had to go to bed, although his own home was only a short distance from town. Gibbs shows that even if Kunkel was injured in 1861 as sworn to by Dr. Buckmaster, that he wore no truss in 1862–1863 and had no occasion for any, and Kunkel swears positively he never wore one before he was injured in 1869. Of the four witnesses whose testimony counsel for defense claim the jury entirely ignored, none of them swear or intimate that Kunkel was not injured in 1869 as alleged in his petition — nor that he ever received any injury previously — while on the contrary Kunkel explains fully to the jury, and evidently to their entire satisfaction, why he made the statements to Kirby and Hogeboom, as sworn to by them. But again, all the witnesses were before the jury in person — they saw them — they heard them testify — they were all fellow-citizens of the jurymen, living in the same county with them, and they found specially in answer to a special question, that Kunkel was not ruptured before the 18th of August 1869 where he now wears a truss; but he had what he called ruptured veins in his leg. There was not only *some* evidence upon which to base the verdict, but there was as we claim, and as we think, a great abundance

of it. Not only this jury of twelve men found these facts, but a previous jury of like number of the citizens of Jefferson county, on a previous trial, found the same facts in the same way. The able judge who tried·the case in the district court heard all the evidence twice—the first time he set aside the verdict and granted a new trial, because of his own motion he excluded certain testimony, as he afterward thought, improperly. At the second trial, the court rendered judgment upon the verdict, and refused to grant a new trial. The decisions of this court which counsel for plaintiff in error seek to attack, have been promulgated for some time, and have met with the entire approbation and concurrence of the bar, and are the admitted law of the land, and need no argument from us or from others to sustain them.

The opinion of the court was delivered by

BREWER, J.: This action was tried and judgment rendered in favor of the plaintiff upon a petition, of which the material allegations are as follows:

"The plaintiff, Jerome Kunkel, complains of the said Kansas Pacific Railway Company, the defendant herein, for that the said defendant was, on August 18th 1869, and from that time till now has been, a common carrier of, and in the business of carrying, passengers on its railroad, in the state of Kansas, in the county of Jefferson, for pay; that on said 18th of August 1869, the said defendant undertook and promised to carry this plaintiff from the city of Topeka, in the county of Shawnee, in said state of Kansas, to the town of Medina, in said Jefferson county, for the sum of one dollar, which said sum was then and there duly paid to the said defendant by this plaintiff, and this plaintiff went on board the car or carriage of the said defendant, on and under and by virtue of said agreement, and was conveyed in said carriage from the said city of Topeka eastwardly towards said town of Medina; but, in violation of its said contract and agreement, the said defendant refused to stop its said carriage for this plaintiff to get down at said town of Medina, but carried this plaintiff past the said town of Medina, and ordered and directed this plaintiff to get down from said carriage more than a mile from said town of Medina, where

there was no regular stopping-place or station for passengers to get on or off the train, and no platform or other convenience to step on; and when this plaintiff attempted to dismount from the said carriage, in obedience to the said order and direction of the said defendant, the said defendant, without notice to this plaintiff, violently and suddenly started their said carriage and with great force threw this plaintiff down from the said carriage to the ground, and wounded, bruised and beat him, this plaintiff, and greatly injured him by said wounds and bruises; of which injuries the plaintiff has not yet recovered, to the damage of this plaintiff in the sum of five thousand dollars."

Several questions are presented; and first, it is alleged that the court erred in permitting an amendment of the petition, and in not sustaining an objection of the defendant to the proposed amendment. The petition as originally filed was substantially and almost word for word identical with that we have quoted, except that the fare alleged to have been paid was three dollars, and the date of the transaction was given as "March 20th 1869." When the case was called for trial, objection was made to the introduction of any testimony, and the cause of action stated in the petition being apparently barred by the statute of limitations, the objection was sustained. Leave was granted to amend, and the present petition was filed over the objection of the defendant. By this the injury was alleged to have been received at a date less than three years before the filing of the petition, and therefore it disclosed a cause of action not barred. Was this error? On the trial the plaintiff testified to receiving his injuries on the 17th or 18th of August 1869; and a witness who was with him at the same time testified to the matter as happening in August 1869; and each testified to paying one dollar, the usual fare from Topeka to Medina. Now the amendment of pleadings is largely within the discretion of the trial court, and there must be something to indicate that such discretion has been abused before a reversal will be ordered because of the granting of leave to amend; *Taylor v. Clendenning*, 4 Kas. 524; *Davis v. Wilson*,

1. Amending pleadings.

2. Time; limitation of action. 11 Kas. 74. It certainly is no abuse of discretion to permit the correction of a date; *Wilson v. Phillips*, 8 Kas. 211. And this it seems is all that the amendment amounted to. Counsel labor ingeniously to show that a cause of action not barred was, by the amendment, substituted for one barred; but we are not convinced by their reasoning. It is affirmatively shown that plaintiff was injured, as claimed, in August. It does not appear that he was ever so injured before; and there is surely no presumption that the defendant ever wronged the plaintiff twice in the same place, and under like circumstances. A second position of

3. Nature of action. counsel is, that the cause of action is not one arising from contract, but is founded upon tort, and that therefore it was barred any way, even if August instead of March was the time of the injury. This claim cannot be sustained. While the distinction between actions on contract and those for tort is plain and broad, yet, as is well said in the case of *Staley v. Jameson*, 46 Ind. 159, on which counsel mainly rely, and in which is quite a full discussion of the question, it is not always easy to determine from the allegations of the petition in which class the action must be placed; for contracts are often alleged in actions which clearly sound in tort, and as often tortious acts and conduct of the defendant are averred in actions purely *ex contractu*. And often the plaintiff has his election upon the same state of facts, whether to bring an action *ex contractu*, or one *ex delicto*. Here the pleader alleges that the defendant was a common carrier, that it made a certain contract of carriage, and received its pay therefor, and then alleges that defendant broke said contract, and how it broke it. True, in showing how defendant broke the contract it discloses wrongful acts done by defendant; but still the manifest gist of the action is the breach of the contract, and the tortious acts are simply the manner of the breach. The case was tried in the district court upon the theory that it was an action *ex contractu*, and the first briefs of the learned counsel were prepared upon the same understanding; and this was correct.

A further complaint is, that the court refused to give this instruction:

"7. It is the duty of the jury to reconcile, if possible, the testimony of witnesses, so as to make them all testify truly; but if in this cause there is an irreconcilable conflict in the testimony of witnesses, and plaintiff is in conflict with the testimony of disinterested witnesses, the law rather presumes that the plaintiff has been influenced by his interests to speak untruly, and that the disinterested witnesses are entitled to the confidence of the jury. Disinterested witnesses are entitled to more credit than interested witnesses."

The court had at the instance of the defendant already given this instruction:

"6. The plaintiff is an interested witness in this cause. He is interested in the whole amount of any possible recovery, and in all the costs in the cause. His credibility is directly in question. Interested witnesses may be more readily suspected of prevaricating, or even testifying falsely in their own behalf, than witnesses who have no interest in the cause."

It had also in its general charge given the law in substantially the same language. In this we see no error. The court properly called attention to the plaintiff's interest, and the effect of such interest upon his credibility; and that was as far as it was under any obligation to go. It was not for it to say directly, or by manifest implication, that it was the duty of the jury to believe one witness rather than another. Matters affecting the credibility of a witness are proper testimony, and may properly be noticed — indeed, ought to be noticed by a court in its charge. But care must be taken that these matters are not laid down in the form of such imperative rules as to extort a verdict which is not in accord with the honest belief of the jury. Tell a juror that he ought to believe a disinterested rather than an interested witness, naming him, and he may return a verdict to say so, when in fact he honestly and sincerely believes the other way, and upon all the circumstances justly does so. It is the jury, and not the court, whose province it is to determine the credibility of a witness, to believe or disbelieve him; and it is the actual belief which

<span style="margin">4. Credibility of witness; instructions.</span>

is sought to be obtained. Hence, instructions which make it matter of law to disbelieve, are wrong. *Shellabarger v. Nafus,* 15 Kas. 547. So also, instructions whose apparent purpose and tendency are to compel belief, or disbelief, are erroneous; and generally any unnecessary repetitions or specializations in instructions which seem to manifest an insisting by the court on the belief or disbelief of a witness should be avoided. We do not decide that the instruction refused is of itself too strong, or that it would in every case be error to give such an instruction. But we do hold that having given at the instance of the defendant the law as stated in the 6th instruction, it was not error to refuse to repeat it in the strong and positive terms of instruction No. 7.

A final error complained of is, that the verdict is against the evidence. The case comes clearly within the rule so often declared by this court, that where there is clear and positive testimony sustaining every essential fact, and the verdict has received the approval of the trial court, this court will not interfere, even though the testimony seems to greatly preponderate the other way. In other words, in cases brought here on error from a trial upon oral testimony, this court is not a trier of questions of fact. We might therefore simply rest this opinion upon the statement, that the plaintiff's testimony positively and clearly shows all the facts necessary to sustain the verdict; that it is in most of the principal matters positively corroborated by one who appears to be an entirely disinterested witness, and as to the matter in which it is chiefly contradicted receives strong support from another witness also apparently disinterested. But as counsel earnestly challenge the rule, we may be pardoned if we tarry a moment or two upon it. And first, we may remark, that it is a rule uniformly recognized from the first existence of this court down to the present time. In the very first volume of Kansas Reports, in *Backus v. Clark,* p. 303, the court reversed a judgment because against the evidence, taking pains to say that it did so because there was a total failure of proof upon one essential fact, and that

*5. Verdicts, when not disturbed.*

when there was such a total failure a question of law was presented calling for the action of the reviewing court. The implication was very clear. The doctrine has been affirmatively announced time and again, since then, and in almost every volume of the reports. See among others: *Bayer v. Cockerill*, 3 Kas. 294; *Ermul v. Kullok*, 3 Kas. 499; *U. P. Rly. Co. v. Convers*, 4 Kas. 206; *Blair v. Fields*, 5 Kas. 58; *Rose v. Williams*, 5 Kas. 488; *Pacific Rld. Co. v. Nash*, 7 Kas. 280; *School District v. Griner*, 8 Kas. 224; *Ulrich v. Ulrich*, 8 Kas. 402; *Ruth v. Ford*, 9 Kas. 17; *Luke v. Johnnycake*, 9 Kas. 519; *K. P. Rly. Co. v. Montelle*, 10 Kas. 126; *St. Jos. & D. C. Rld. Co. v. Chase*, 11 Kas. 47; *Brewster v. Hall*, 12 Kas. 161; *A. T. & S. F. Rld. Co. v. Stanford*, 12 Kas. 354; *Bridge Co. v. Murphy*, 13 Kas. 40; *K. P. Rly. Co. v. Salmon*, 14 Kas. 528. In the early case of *Ermul v. Kullok*, 3 Kas. 501, Chief Justice Crozier says: "It is a well-established rule of this court, that the verdict of a jury will not be disturbed if there is any testimony to sustain it." The rule has not at any time been stated in stronger language by any member of this court. Nor is this court the only or the first court to announce this doctrine. In *Rogers v. King*, 12 Ga. 233, the supreme court say: "If there was any evidence to justify the verdict, we would not disturb it." And the same proposition was sustained in *Alfred v. The State*, 6 Ga. 483; *Lewis v. Long*, 20 Ga. 568. The supreme court of Arkansas used this language: "There not being a total want or failure of evidence to sustain the verdict, this court affirms the judgment;" *Bennett v. The State*, 13 Ark. 694. And again, "Though the verdict of a jury be contrary to the judgment of the appellate court, it will not be set aside unless there is a total want of evidence to sustain it;" *McDaniel v. Parks*, 19 Ark. 671. See also *Mains v. The State*, 13 Ark. 285; *Lindsay v. Wayland*, 17 Ark. 385; *Hill v. Jayne*, 18 Ark. 396; *M. & St. F. Plank Road Co. v. Bauere*, 21 Ark. 306. In California, the supreme court thus lays down the rule: "The appellate court will not disturb the verdict when there is any evidence to support it;" *Escolle v. Merle*, 9 Cal. 94. In Illi-

12—17 KAS.

nois we find, "The court will rarely if ever disturb a verdict when there is anything in the record tending to support the finding of the jury;" *Young v. Silkwood*, 11 Ill. 36; *Gallup v. Smith*, 24 Ill. 586. In Indiana, "A new trial will not be granted where the evidence is conflicting, if there is enough in the record taken by itself to sustain the verdict;" *Scobey v. Armington*, 5 Ind. 514. In Missouri, "When the verdict of a jury comes here indorsed by the refusal of the court which tried the cause to grant a new trial, this court will not interfere on the ground that the evidence does not support the verdict. Jurors are the appropriate judges of the facts, as the courts are of the law;" *State v. Anderson*, 19 Mo. 246. And again, "The refusal of a court to grant a new trial where a motion is based on alleged absence of any testimony to warrant a verdict, is not error, unless the preponderance of evidence against the verdict is so strong as to raise a presumption of prejudice, corruption or gross ignorance on the part of the jury;" *Price v. Evans*, 49 Mo. 396. In Kentucky, "This court will not reverse on the ground that the verdict sustained by the inferior court was contrary to evidence where there was any evidence conducing to maintain it;" *Bagby v. Lewis, Adm'x*, 2 T. B. Monroe, 76. In Tennessee, "The court of errors will not grant a new trial if there be any proof by which the verdict can be sustained;" *Dodge v. Brittain*, Meigs, 84. And again, "It is a well-settled rule of practice in the supreme court, that in civil cases a verdict will not be disturbed if there be *any evidence to support it*, however unsatisfactory that evidence may appear by the record;" *McKinney v. Craig*, 4 Sneed, 577. In New Hampshire, "Where there is evidence competent to be considered by a jury, and the court submit it for their decision, the verdict will not be set aside, although the court may be of opinion that the evidence was insufficient to prove the fact;" *Wendell v. Moulton*, 26 N. H. (6 Foster) 41. In Michigan, in a case taken by *certiorari* from a justice of the peace to the circuit court, "If there was evidence before the justice to prove every fact necessary to sustain the judg-

ment, the circuit court cannot reverse it, however much it may be dissatisfied with the conclusion of the justice or the jury. All it can do is to inquire whether there was a total want of evidence before the justice to prove some fact that should have been proved to sustain the action;" *Welch v. Bogg*, 12 Mich. 43. In New York, "The verdict of a jury cannot be interfered with except when the evidence is wholly insufficient to sustain the verdict;" *Colt v. Road Co.*, 33 N. Y. Superior Ct. 189. In Iowa, "Always refusing to interfere when there is evidence upon which the verdict finds reasonable support, even when if sitting as jurors we would without hesitation have found the other way upon the evidence;" *Carlin v. Road Co.*, 37 Iowa, 323. But it is useless to multiply citations. Scores and scores of cases can be found in which similar language has been used by appellate courts. And it must be conceded it is also equally true, that there are multitudes of cases in which appellate courts have reversed the judgment of lower tribunals because contrary to the evidence, and in which they have said that while there is simply a conflict in the testimony, yet it is apparent that the verdict or finding was clearly against the weight of the evidence, and manifestly unjust, and therefore it was their duty to set it aside. All that we design by these citations, and it will be noticed that they are nearly all from the earlier reports of the several states, is to show, that in this rule of decision we have been guilty of no "innovation;" we have discovered no new thing, but are simply walking *super antiquas vias*. Into a discussion of the wisdom of the rule, we do not now care to enter. It has been commented on time and again in opinions filed by this court; and while it may sometimes result in injustice, yet we are confident a different rule would tend to far greater injustice and wrong. Testimony on paper, is not like testimony from the lips; and when twelve jurymen who hear the living voice, and see the man who utters it, believe one witness and disbelieve four, and the judge who has the same opportunities of judgment declares that he thinks that they ought to have so believed

and disbelieved, it seems very like trifling with the sacred-
ness of jury trials for us who know nothing but the written
story of what was said and done, and that story too often
imperfect and incomplete, to decide that all this is wrong,
and that jury and judge ought to have believed and found
the other way. But counsel contend that trial judges in
this state imagine the same rule governs their action as ours.
We do not positively know how this may be. Two of our
number have had experience as trial judges, and never so
understood the law; and we have yet to meet a district judge
who has so expressed his understanding thereof. The func-
tions of the two are widely dissimilar. The one has the
same opportunity as the jury for forming a just estimate of
the credence to be placed in the various witnesses, and if it
appears to him that the jury have found against the weight
of the evidence it is his imperative duty to set the verdict
aside. We do not mean that he is to substitute his own judg-
ment in all cases for the judgment of the jury, for it is their
province to settle questions of fact; and when the evidence is
nearly balanced, or is such that different minds would nat-
urally and fairly come to different conclusions thereon, he has
no right to disturb the findings of the jury, although his own
judgment might incline him the other way. In other words,
the finding of the jury is to be upheld by him as against any
mere doubts of its correctness. But when *his judgment* tells
him that it is wrong, that whether from mistake, or preju-
dice, or other cause, the jury have erred, and found against
the fair preponderance of the evidence, then no duty is more
imperative than that of setting aside the verdict, and remand-
ing the question to another jury. It was a fear, in view of
the meagerness of the testimony, that this duty had not been
fully recognized, that drew from this court the expressions
it used in the two cases which counsel especially criticise.
Whenever on the other hand a case reaches this court upon
the record, and it appears that the trial court has, by over-
ruling a motion for a new trial, approved of the verdict, it is
and must be taken as its certificate that the verdict is either

fully in accord with its belief upon the testimony, or else
that there was such a fair and reasonable doubt as to the
weight of the evidence, *pro* and *con*, that honest and intelli-
gent minds might fairly differ in their conclusions, and that
therefore the verdict of the jury should be accepted as just.
We have therefore, not the witnesses, but the finding of the
jury *prima facie* right, and also the approval of the only
judge who has anything like full opportunities of knowing
whether it was right.   Under those circumstances it should
be a very clear case before a reviewing court should interfere.
The due administration of the law demands, and in the long run
the most satisfactory and the most complete justice will be se-
cured by leaving the settlement of questions of fact to the
tribunals which see and hear the witnesses.

The judgment will be affirmed.

All the Justices concurring.