### STALLABY v. GALLAGHER et al.

No. 18636. Opinion Filed May 1, 1928.

Rehearing Denied June 26, 1928.

(Syllabus.)

1. **Appeal and Error—New Trial—Application on Ground that Verdict Against Law and Weight of Evidence—Insufficient Showing.**

In a law case involving a single issue of fact tried before the court with a jury, and where the evidence on each side is voluminous, sharply contradictory and sufficient to sustain a verdict for either party, and where the jury, under instructions which are not assailed, returns a unanimous verdict for defendants, and where plaintiff files a motion for new trial on the ground that the verdict is against the weight of the evidence and against the law, and the same is argued before the court and by the court overruled and judgment rendered on the verdict, and where plaintiff in this court contends that the evidence is insufficient and that the court did not approve the verdict, and where plaintiff points out nothing in the record to sustain his latter contention, except that at the time the parties rested their case plaintiff moved for an instructed verdict, which was overruled, and defendants moved thereupon for a like verdict, which was also overruled, the court remarking to defendants' counsel that the evidence of one of plaintiff's witnesses was almost conclusive, and that he did not see how defendants could get around

it, but the case proceeded to final judgment, without other comment of the court upon the evidence, it is held that such remark of the trial court during the progress of the trial is not sufficient to show his dissent from or disapproval of the verdict and judgment as finally passed, and plaintiff's contention in that behalf is without merit.

2. **Evidence—Unofficial Maps Admissible to Elucidate Testimony.**

Unofficial maps, proved to be correct, are admissible in evidence in connection with the testimony of witnesses to explain and elucidate such testimony. The evidence in this case as to the identity and correctness of the scale map or diagram has been examined along with the evidence sought to be explained thereby, and, held, that the court did not err in admitting such map or diagram in evidence.

3. **Appeal and Error—Discretion of Trial Court—Latitude in Examination of Witnesses.**

The latitude allowed on examination and cross-examination of witnesses is largely within the sound discretion of the trial court; and, unless such discretion has been abused to the manifest injury of the complaining party, the case will not be reversed for alleged error therein. Held, in this case, that the trial court did not abuse such discretion in the trial of this cause.

4. **Judgment Sustained.**

Evidence examined; held, that it supports the verdict.

Commissioners' Opinion, Division No. 2.

Error from District Court, Carter County; Asa E. Walden, Judge.

Action by Emeline Stallaby (McClure) against James H. Gallagher et al., for recovery of real estate. Judgment for defendants, and plaintiff appeals. Affirmed.

Kent V. Gay and Claud Briggs, for plaintiff in error.

Rainey, Flynn, Green & Anderson, Champion, Champion & Fischl, Chas. H. Hudson, Fuller, Porter & Fuller, George N. Otey, J. B. Moore, S. N. Hawkes, Edward H. Chandler, Summers Hardy, Ralph W. Garrett, and Carl F. Griffith, for defendants in error.

BENNETT, C. This was a civil action, tried in district court of Carter county, Okla., wherein Emeline Stallaby, formerly McClure, was plaintiff, and James H. Gallagher, Gladys McIntire, A. U. Thomas, Wirt Franklin, Roy M. Johnson, Empire Pipe Line Company, Lone Star Gas Company, Consumers Light & Power Company, Page Oil Syndicate, Johnson & Kemnitz, J. Alfred Johnson, Magnolia Petroleum Com-

pany, Sinclair Pipe Line Company, and others, were defendants. The parties will be referred to in same order in which they appeared in trial court.

Plaintiff's petition states that Harry McClure and plaintiff were duly enrolled as full-blood Choctaw Indians, and were legally married; that thereafter, on February 7, 1914, Harry McClure died intestate in Latimer county, Okla.; that about 60 days after his death, there was born to him by plaintiff a posthumous child, Jincy McClure by name, who lived only about two months; that within a few days after death of Harry McClure, and prior to birth of said infant, plaintiff, together with Leuna Folsom, a sister of Harry McClure, conveyed both the surplus and homestead lands allotted to Harry McClure to some of defendants in the cause, and that the other defendants acquired their titles mediately or immediately thereunder; that said conveyances were approved by county court of Latimer county, Okla. There are set out in petition the various interests claimed by defendants. and all are alleged to be void, and vacation thereof with rents and profits is sought. Such relief is asked by plaintiff on the ground that Jincy McClure and plaintiff, upon the death of Harry McClure, each inherited one-half of the lands allotted to said Harry McClure, as surplus, and that all of the lands allotted to him as homestead were inalienable, and that said Jincy McClure having died unmarried and without issue when only three months old, plaintiff succeeded to her interest. Description of lands set out in patents recorded in office of county clerk, Carter county, patent record 1, p. 279, and patent record 2, p. 383.

For the most part, separate answers by the several defendants were filed, setting up, in effect, a general denial, and appropriate replies were filed by plaintiff. The case was tried upon issues made February 21, 1927, when a stipulation was entered into providing that the question of fact as to whether or not Jincy McClure was born, lived and died should be submitted to jury, and that should same be determined in favor of plaintiff, the question of accounting should be later disposed of. Under stipulation, therefore, only one issue was presented, to wit, was Jincy McClure a child born alive to Harry McClure and Emeline Stallaby, his wife, subsequent to death of Harry McClure early in 1914, and did said Jincy McClure thereafter die unmarried and without issue and leaving as her sole and only heir her mother, plaintiff herein?

The cause was tried to a jury, which found the issues in favor of defendants, and, plaintiff, after filing motion for new trial, which was, by the court, overruled, appeals to this court.

Plaintiff devotes considerable space in her brief to a discussion of what the rights of plaintiff would be with reference to homestead lands, and also surplus allotment lands of her deceased husband under section 9 of the Act of Congress, approved May 27, 1908, 35 Stat. at L. 312, and also under section 4974, C. O. S. 1921, providing as follows:

"A child conceived, but not born, is to be deemed an existing person so far as may be necessary for its interest in the event of its subsequent birth."

Plaintiff also sets out that she is not estopped by reason of her warranty deed made to this property, and cites in support thereof Oklahoma cases, but, since the jury has found against plaintiff, and under our holding herein, we deem it unnecessary to discuss these questions no longer relevant.

Plaintiff makes three assignments of error. Her first proposition is:

**1. That the court was satisfied from the evidence that the issues should have been found in favor of the plaintiff, and the verdict of the jury and judgment of the court having been challenged, in that the verdict of the jury and judgment of the court were not sustained by the evidence, and were contrary to the evidence, that the court should have granted a new trial.**

Plaintiff's first contention is based upon the fact that after plaintiff and defendants had rested their case, plaintiff filed motion for an instructed verdict, which motion was, by the court, overruled without comment. Thereupon defendants moved the court to instruct jury to return a verdict in favor of defendants. In overruling his motion for an instructed verdict on behalf of defendants, the court said:

"Why, Mr. Anderson, instead of moving for an instructed verdict, you would have to convince this court the old buttermilk woman was mistaken. Her testimony seems almost conclusive to me, and I don't see how you are going to get away from it. Defendants' motion for an instructed verdict is overruled."

Mrs. Emma Cooper (the buttermilk woman) testified, in substance, as follows: That she lives at Red Oak; in 1914 she lived at Lodi on Granna Baker's place; knew Harry McClure when she lived on Granna's place; thinks he died in 1914, but not positive, and remembers the occasion

of his dying. She supposes that Harry Mc-Clure was married; his wife's name is Emeline; lived something near one-fourth mile from them. They did not have any children she knows of at the time of his death, but a short time after Harry's death, two or three or four weeks, something like that, a child was born; she saw it at the home of Emeline and Harry; Emeline had been away from home quite a bit, and witness saw her when she came back and witness went over to see her about milk and butter she had been getting from witness; talked with Emeline about the baby and the milk and butter. The witness took the child in her hands. Witness' little boy six or eight years old was present; showed baby to the little boy; the infant was a few days old; it was alive.

"Q. Do you know if that child is living or dead? A. They tell me it died; really, I don't know. * * * The Court: You say you knew Emeline at the time her husband died? A. Yes, sir. Q. She have a baby then? A. Not that I know of."

Cross-examination:

"We moved to that place in 1911 in the fall; had known Emeline before that time, but did not know Harry until we moved to Granna's place. Moved away from the place in 1915, in the fall of the year. Q. Was Harry and Emeline married when you moved on the Baker place? A. I don't know. Q. Was Harry living there anywhere? A. I don't remember that. Q. Where was he living the first time you remember him? A. First time I remember seeing Harry he and Emeline were passing around. Q. You don't know where they lived? A. Not when I first saw Harry. I don't know where they lived. Q. How long was that after you moved there? A. I don't remember how long. I don't think very long after we moved to Grandma Baker's place. Q. You just saw this one child? A. Yes, sir. Q. That is the only one you remember seeing? A. Yes, sir. Q. That is the only one you remember of? A. Yes, sir, it is. Q. And the only one you ever heard of them having? A. Yes, sir, that I remember of, of Harry and Emeline. Q. Did you go to Harry's funeral? A. No, sir. Q. Or the baby's funeral? A. No. sir."

Plaintiff contends that it was the duty of the court to sustain plaintiff's motion for new trial on account of the fact that the court indicated, at the time he overruled defendants' motion for directed verdict, that the foregoing evidence of Emma Cooper seemed almost conclusive to him, and that

they would have to show him some explanation of it, and in this connection plaintiff cites Horton v. Prague National Bank, 60 Okla. 240, 159 Pac. 930, wherein it is held:

"This court has frequently held that it is the duty of the trial court to either approve the verdict of the jury, or to grant a new trial; that if in his conscience he does not believe the verdict to be just and in accordance with the weight of the evidence, he should set it aside. * * *"

Also, the case of White v. Dougal, 60 Okla. 200, 159 Pac. 907, wherein the court held:

"* * * In passing upon a motion for a new trial, where the verdict is challenged because not supported by the evidence, and contrary to the evidence, and because it is not responsive to the demands of justice, it is the duty of the trial court to carefully weigh the entire matter, and unless it is satisfied that the verdict is responsive to the demands of justice and is supported by the evidence, it is his duty to set it aside and grant a new trial."

The same principle is announced in Rison v. Harris, 50 Okla. 764, 151 Pac. 584; C., R. I. & P. Ry. Co. v. Warren, 63 Okla. 190, 163 Pac. 705. Many other cases to the same effect might be cited, but those cases deal with the duty of the trial court on motion for new trial upon challenge of the verdict, upon the ground that it is contrary to the evidence. Manifestly, in such case, it is clearly the duty of the court to weigh all evidence, the law applicable thereto, and the jury verdict, and if the court find that he cannot conscientiously approve the verdict, and is convinced that it should have been for opposite party, it is his duty to set it aside and grant a new trial, and foregoing cases clearly announce that doctrine; but that is not the case at bar. This was simply a remark of the judge made in the midst of the trial. True, the evidence had been introduced, but the instructions to jury had not been given, argument of counsel had not been made, and verdict of jury had not been rendered. The court was not passing upon, nor was he called upon to pass upon, all evidence in the case. His ruling was invoked simply upon the question as to whether or not plaintiff had introduced any evidence reasonably supporting her contention, and if so, it was the duty of the court to overrule defendants' motion for an instructed verdict. It would seem to be entirely unfair and unwise to permit a cause to be reversed upon some remark of the court in passing upon some phase of the case before the conclusion of the matter.

Trial courts, and even appellate courts, change their minds and their opinions upon occasion, due either to the strength of presentation or argument of counsel, or to more mature reflection. Upon hearing the testimony of one witness, or all the witnesses on one side, or even the witnesses on both sides, the court might easily, and often does, jump to the conclusion that this witness is right and the other is wrong, or that one side should win and the other should lose, only to change its opinion upon mature thought, or argument and further presentation of facts and circumstances. Otherwise, what would be the benefit of oral argument before either trial or appellate court? There was before the mind of trial court, under this motion to direct, the sole inquiry whether plaintiff had introduced any proof, which, in the most favorable view, would tend to establish her cause, and the court's mind must have turned immediately to that testimony which the court thought most favorable to her cause, and in considering that under the defendants' motion to direct a verdict, it was passing upon only the question of whether there was any evidence, taken in its most favorable light, which reasonably supported plaintiff's cause of action; and although the language is somewhat broader than necessary to a decision on that point, in fact it was not necessary for the court to have gone to the extent it did go in its announcement, nevertheless, it must be understood from the action of court and of parties that the court was not meaning to pass upon the whole controversy, but was simply evidencing its rather strong view that defendants were not entitled to an instructed verdict, and that plaintiff had introduced evidence sufficient to take the issue to the jury.

We must assume that plaintiff's counsel were as much convinced of the correctness of their position on this point, when they presented and argued to court their motion for new trial, as they are now in presenting it to this court, and, if so, they must have presented the very argument to trial court which they now present here; that is, in effect, that trial court had already expressed himself as satisfied with the testimony of Mrs. Cooper, and that the evidence was the same, and therefore the court logically should have the same opinion, and should treat the evidence of Mrs. Cooper as conclusive. The only fair presumption is that they did so present the matter in this light to the trial court, and that the trial court disagreed with them and overruled their motion for new trial based on that ground.

From the amount of evidence in this case, the number of parties interested, and the number of counsel, it would be fair to assume that some time intervened between remarks of court referred to on defendants' motion to direct and argument of the motion for new trial by plaintiff, and during said period the court must have given serious thought to the issues involved, as well as during the argument of the motion for new trial. There is no word of proof, or evidence, or record, or even a suggestion in this case, that discloses, or tends to disclose, that trial court was not satisfied with verdict at time it was presented to it to be passed upon in due course in motion for new trial or at time judgment was actually rendered. Every presumption is that it was so satisfied or it would not have approved the verdict and rendered judgment.

In the case of C., R. I. & P. Ry. Co. v. Warren, supra, the court says:

"This duty of the court does not prevent his yielding his impression or opinion and adopting those of the jury, if upon consideration of the evidence the court is of the opinion that the verdict is right, and by reason thereof yields his own opinion to that of the jury, and, so yielding, approves the verdict."

To the same effect: Railway Co. v. Kunkel, 17 Kan. 172; Searles v. Searles, 35 Ore. 289, 57 Pac. 634. Almost the identical language is used in Futterman v. Gott, 96 Okla. 47, 220 Pac. 44.

We therefore hold that there is no showing that the court did not approve the verdict, or that it was dissatisfied therewith.

**2. That the court erred by improperly admitting a plat of a portion of the cemetery referred to in the evidence.**

In order that this exact point may be clearly understood, it was plaintiff's contention that she had one child very soon after she married Harry McClure; that its name was Jincy; that it lived two months, died, was buried in Cedar Cemetery among the graves of its blood kin; that her husband died two years thereafter, and that she, within three weeks after his death, gave birth to another child, also named Jincy, who, within a few weeks, died, and was buried in the same cemetery. It was the contention of defendants that no such child ever existed. Defendants offered in evidence a drawing or scale map covering that part of the cemetery wherein plaintiff claimed the posthumous child was buried. Plaintiff objected in the following words:

"We object to it for the reason that it is

shown by the testimony of this witness (Stovall) the plat and information based thereon is hearsay testimony, and is not properly identified."

Taking up the objections in order: Was the plat based on hearsay testimony? Cyrus Lewis testified, in substance, that he was the keeper of the cemetery, and that he buried or helped bury every person buried therein since the year 1902; that he had lived for 30 years within 200 yards of the cemetery and had charge of the same for many years; that the scale map correctly represents that portion of the cemetery where the child in question was alleged to have been buried, and that it shows all of the graves therein, and the surrounding fences, and that he gave to Green Stovall, a civil engineer, the names of the persons occupying graves in that particular spot, and on cross-examination he was asked:

"Q. Cy, how do you know that these different people are buried in these graves when the graves are not marked? A. I buried them. That is the reason."

He further testified that he helped dig the graves of all those identified on the plat, and that he gave all this information to Green Stovall, who drew the diagram, and that the same correctly represents that portion of the cemetery and the graves of those buried therein.

Green Stovall testified that he was a civil engineer, and that he made the scale drawing showing the location of all graves in that portion of the cemetery; went over the cemetery with Lewis, who gave him the information as to the names of the persons buried there; many of them are on the burial stones, but where there were no markers, his information came from Lewis, but that he examined the entire area for graves, and where there were unmarked graves, the place could be identified by the broken ground. The land had not been plowed, and was well kept, and wherever there had been a grave, it could be told; that he made his map showing these graves and the various measurements, and that the same is a correct map of that portion of the cemetery, and that the distances thereon shown are correct. He further said he knew Cedar Cemetery himself, and that Cyrus Lewis helped him in the preparation of the map, and that it represents correctly every grave there.

We must hold that the objection that the map was based on hearsay is without merit.

Was the map or plat sufficiently identified? We are at a loss to know how a map could be identified more accurately than by the

two men who made it, and who have testified that the same correctly represents that portion of the cemetery. Plaintiff refers to the case of U. S. v. Montana Lumber & Mfg. Co., 196 U. S. 573. The government sued for conversion of certain timber. The railroad company had the land surveyed by its own surveyor, and determined that the timber came from land that would be in section 5, and that, therefore, being an odd numbered section, it came under a grant to the defendant covering every odd-numbered section within a certain radius, but the court held that the only right of survey was reserved and vested in the government, and until the government surveyed and located the sections, the railroad company did not own any of the land or timber. That is not like the case at bar.

"It is common practice in the courts to receive private or unofficial maps, diagrams, or sketches, for the purpose of giving a representation of objects and places which generally cannot otherwise be as conveniently shown or described by witnesses, and when proved to be correct or offered in connection with the testimony of a witness, they are admissible as legitimate aids to the court or jury. For example, in personal injury cases, maps or diagrams of the scene of the accident are very generally admitted when shown to be accurate, and the same is true in controversies with respect to real property, where it is desired to show the condition and situation of the premises, or the location of a house  A diagram of the location of wounds, authenticated by a physician's testimony, has been held admissible. While the map, diagram, or sketch must be accurate in order to warrant its admission, this requirement does not extend to strict mathematical accuracy, and it has been held that a lack of accuracy goes merely to the weight and not to the admissibility of the evidence."   22 C. J. p. 910, par. 1114.

See, also, 10 R. C. L. p. 1152; also note 15 to the above citation of C. J., citing cases from various states.

In M., K. & T. Ry. Co. v. Smith, 97 Okla. 152, 223 Pac. 373, the court quotes from Jones' Commentaries on Evidence, vol. 3, p. 51, as follows:

"It is clearly necessary in order to render diagrams, models, photographs, and the like, admissible in evidence, that preliminary evidence would be given of the correctness of the representation; and when such evidence is introduced, this is a preliminary question for the determination of the trial judge, * * * and his decision upon this question will not be reviewed by the appellate court."

The court says further in this case:

"The cut did not purport to be a photo-

graph or exact representation of the interior of the cab of defendant's engine, and therefore the rule announced in Colonial Refining Co. v. Lathrop, 64 Okla. 47, 166 Pac. 747, relative to photographs, is not applicable. We think the question on this contention is whether the trial court abused its discretion in permitting the cut or diagram to be offered in evidence under the preliminary showing made, and from our examination of the record, we are unable to see that any clear or manifest abuse of discretion is disclosed. Therefore, under the rule announced by Jones on Evidence, the contention made relative to the introduction of the cut or diagram cannot be adjudged to be reversible error by this court."

This map was used in connection with and explanatory of the evidence of Cyrus Lewis, and also the evidence of Green Stovall, and to show the location of the graves of the kinsmen of plaintiff and the surrounding conditions in that part of the cemetery in which plaintiff claimed the child was buried. The great burden of evidence in this case was oral. We are entirely clear that it was not an abuse of discretion of the court to permit the introduction of this map under the proof adduced.

3. Plaintiff next complains of the testimony showing the activities of J. H. Gallagher and Bill Gallagher in connection with this case on the side of plaintiff. Plaintiff directs attention to the cross-examination of plaintiff's witness, Elmer Cooper, and sets out one-half page of questions and answers as illustrative, but the only one objected to is as follows:

"Who is the first one who ever talked to you about this lawsuit?"

Certainly, there was no error in permitting such a question. They object also to the cross-examination of plaintiff's witness, Louis Hunt, and almost one-half page of questions and answers are detailed in the brief, but the record shows the only one objected to was:

"You did want to do anything reasonable you could to help them (Bill Gallagher and J. H. Gallagher)?"

We see nothing harmful in that question. Also, the cross-examination of the witness, Clayton Arnold. The record does not disclose any objection or exception by plaintiff to the examination of this witness. As to witness, Johnson Coley, the three following questions were objected to:

"Did either one of them (the Gallaghers) ever talk to you about this case? What did they talk to you about? Did they tell you there was one born after Harry McClure's death or not?"

They also complain of the following question addressed to Eva Johnson:

"When Will Caldwell came to see you at your house, did he tell you that there was a child born after Harry died?"

Defendants' counsel also questioned their witness, Calvin Jefferson, as to whether or not J. H. Gallagher or Will Gallagher had talked to him about the case, and the only question of importance is as follows:

"Q. Did he (J. H. Gallagher) try to get you to say that there was a baby born after Harry died? A. He said—he went over there and asked me to remember about Emeline had another baby, and I said, why, I don't remember."

This was at J. H. Gallagher's store, and Bill Gallagher was present, and the following questions were asked of Cyrus Lewis by defendants' counsel:

"Q. Did Bill Gallagher ever come out there and get you to show him the graves in that cemetery? A. Not since the map was made. Q. Did he before? A. Yes, sir, he was there before."

Most of these questions are entirely colorless and inoffensive, and could have harmed no one.

It must be had in mind that the issue in this case was whether or not a child, Jincy McClure, was born to plaintiff within a month or so after the death of her husband, plaintiff maintaining that she had such a child, and for that purpose introduced her own evidence and that of her friends and neighbors. The defense was grounded solely upon the contention that no such child ever existed. It was not a question of construction (of agreement, or of good faith, nor of intention, nor was it a question of any misunderstanding or doubtful conclusion, or mistake of fact. It was simply an issue of fact about which there could be no misunderstanding. Plaintiff either had a child after the death of her husband, or she did not have such child, and if she had such child, she knew it, and it is safe to assume that most, if not all, of her witnesses knew it. It is likewise true that, if she had such child, many of the defendants' witnesses must have known it. If plaintiff were seven or eight months advanced in pregnancy at the time of the burial of her husband (which seems to have been well attended), those round about, who knew plaintiff and had seen her from week to week in her home and passing on the road, and at various places, would have known it. It would have been such a circumstance as would have aroused a distinctly pathetic

interest. It would seem well nigh impossible for the minister who conducted the burial of Harry McClure and remained in the home during the afternoon preceding the burial that night, and a part of the next morning, or the county judge, who, within a few days thereafter, approved her deed, to have been deceived about this woman's condition, and yet several witnesses on her part testified she had such child after her husband died, and more than a score testified that she had no such child, and that they never heard of such child, and all showing that they lived near enough and had sufficient opportunity to know the true state of the matters about which they testified.

We would perhaps be warranted in saying that there was an enormous amount of false swearing in this case. We think, under the circumstances, broad latitude should have been allowed, not only in the examination, but the cross-examination, of these witnesses, to discover the truth. This record discloses that certain parties, concerning whom inquiries were made of witnesses, were very active in this litigation, not as witnesses nor as parties, but their forms can be seen in rather distinct outline through the smoke of battle as they appear in the background. We cannot say who is in the wrong about this matter, but we will say that such examination and cross-examination as has been undertaken in this case has not been such as to afford plaintiff any right of complaint. In cases of deliberate false swearing, it should be and is, we think, the policy of the court to allow as much light as possible to be turned upon the scene. It would serve no good purpose to set out the activities of those who seem to take a very active, but rather covert, interest in this litigation. These activities might be accounted for upon grounds which would not be entirely free from criticism. On the other hand, they may have been acting in entirely good faith. It is sufficient for us to say that the course of the examination of the witnesses does not furnish any ground whatever for reversal of this cause.

4. It is finally contended by plaintiff that the verdict and judgment of the court is contrary to the weight of the evidence, and, in fact, that there is no competent evidence on the part of defendants to sustain the verdict of the jury. Plaintiff argues these two propositions together.

There were several witnesses who testified, in substance, that a child was born to Emeline McClure a short time after the death of Harry McClure. One of these witnesses, Emma Cooper, told about having taken the child in her arms, but there were some things about the cross-examination which tend to weaken the testimony of this witness, as we see it. For instance, she lived on the Granna Baker farm from 1911 to 1915, and in the immediate vicinity of the home of plaintiff, but never saw but one child of plaintiff and Harry McClure, and never heard of them having but one child. She lived within one-fourth of a mile of plaintiff, and does not remember that they ever had but one child. This is perhaps the strongest evidence introduced by plaintiff, aside from her own testimony. For defendants, Cyrus Lewis testified, in substance, that he is 63 years old; has known plaintiff ever since she was a child, and plaintiff's mother and Harry McClure; that they attended church at Cedar, where he was superintendent of Sunday School for 12 years, and assistant deacon and church clerk, and that he lives about 200 yards from the cemetery, and has charge of the church property and the cemetery; knows when plaintiff was married to McClure, and where they lived after marriage; they were members of Cedar Church; he remembers that plaintiff was pregnant at the time she was married to McClure, and that three or four months after the marriage a child was born and its name was Jincy; that this child was buried in Cedar Cemetery; that he helped dig the grave and bury the child; also helped dig the grave for Harry McClure and to bury him at Cedar two years after Jincy was buried; after McClure's funeral plaintiff lived at Elizabeth Baker's place; she had no appearance of giving birth to a child; that she had no such child; never heard of such child, and that no such child of plaintiff as she claims was buried in Cedar Cemetery; that he knows the names of all the persons buried in the cemetery since 1902, because he has helped bury them.

There is further the testimony of Morris Sam, pastor of Cedar Church; knows plaintiff and her mother; they were members of Cedar Church; has known plaintiff since childhood, and Harry McClure since he was a boy. Remembers the birth of Jincy just after she married McClure, about three months after; saw the child at the home of plaintiff's mother, and she told him the child's name was Jincy; the child lived four or five months, died, and was buried in Cedar Cemetery. He, in company with plaintiff, Joe Jackson and Elizabeth Baker, sat up with Harry McClure's corpse, helped dig the grave, and buried him the next after-

noon. He and plaintiff stayed at the home of Elizabeth Baker until eight o'clock the next morning; never heard of any posthumous child.

There are more than a score of witnesses who substantiate the material testimony of these two witnesses. One of them, Annie Boling, a schoolmate of plaintiff, who has known her all her life, and lived within a short distance of her. It is to be noted also that while plaintiff took her mother's deposition, and she was brought to the trial by plaintiff's lawyer, she was not introduced as a witness. According to the evidence, if such child were born, it was born in her house, lived and died in her house, and was named by her. The issue as to the existence of this child was submitted to a jury under instructions to which there were no exceptions, and they returned a unanimous verdict in the following words:

"We, the jury, drawn, impaneled and sworn in the above-entitled cause, do upon our oaths, find for the defendants, and that no child was born, lived and died after the death of Harry McClure."

From an examination of this evidence we are compelled to find that there is sufficient and ample evidence to support the verdict of the jury, for all of which reasons the judgment of the trial court is affirmed.

TEEHEE, JEFFREY, DIFFENDAFFER, and HERR, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 4 C. J. p. 866, §2841; 20 R. C. L. pp. 271-273; 3 R. C. L. Supp .p. 1050; 4 R. C. L. Supp. p. 1349; 5 R. C. L. Supp. p. 1094; 6 R. C. L. Supp. p. 1200. (2) 22 C. J. p. 910, §1114. (3) 4 C. J. p. 822, §2796; p. 823, §2797. (4) 4 C. J. p. 852, §2834.